**HOLMES, Plaintiff-Appellee, v. HROBON,**
**Defendant-Appellant; MANN et, Defendants-Appellees.**

Ohio Appeals, Second District, Franklin County.

No. 4303.   Decided April 16, 1951.

114

116

John H. Summers, Columbus, for plaintiff-appellee.

Herbert & Dombey, Paul M. Herbert, Edwin F. Tuttle, of Counsel, Columbus, for defendant-appellant.

Wright, Harlor, Purpus, Morris & Arnold, Earl F. Morris, of Counsel, Columbus, Pickrel, Schaeffer & Ebeling, Dayton, and Morley, Stickle, Keeley & Murphy, Cleveland, for defendants-appellees.

## OPINION

By WISEMAN, J.

This is an appeal on questions of law and fact from the judgment of the Probate Court of Franklin County. The matter is presented to this Court on the motions of the trustee and legatees to confirm the report of the Referee appointed by this Court, and on the motions of the life tenant to vacate and set aside the report of the Referee and grant a new trial. The principal ground of the motion of the life tenant is that the report is not sustained by sufficient evidence and is contrary to law.

### PART I

This is an action for a declaratory judgment instituted October 3, 1946, by Harry B. Holmes, Trustee of the trust created in the will of Clay M. Thomas, deceased. The widow, Mae Thomas, the life tenant, who has since remarried and is now Mae Thomas Hrobon, and the legatees, Clara J. Thomas Mann, Millie K. Thomas Watson, and Ray G. Thomas, the sisters and brother, respectively, of the testator, and a legatee, Margaret Cassidy, were all named parties defendant. All parties were represented by counsel.

The trustee propounded fourteen questions, which require a construction of the will and a determination of certain issues which arose in the conduct of the trust, an accounting between the trustee and the life tenant, and a determination as to corpus and income as between the life tenant and re- maindermen.

The legatees filed an answer in which they joined in the prayer and relief sought in the amended petition filed by the trustee. The widow and life tenant, Mae Thomas Hrobon, in her answer denied various allegations in the trustee's amended petition, made certain allegations and by way of affirmative relief, asked the Court to instruct the trustee

in respect to eight questions therein set forth, and joined in the prayer of the trustee for the judgment and direction of the Court in regard to the construction of said will and as to the duties of the trustee in the premises.

The Probate Court appointed a special master commissioner to take the testimony. Seven volumes of testimony and hundreds of exhibits were submitted at the hearing, which extended over a period of many weeks. The master submitted his report, which contained a finding of facts and conclusions of law. A judge of the Common Pleas Court of Franklin County was appointed Acting Probate Judge to consider the matter. Judgment was rendered in the Probate Court in April, 1949. Notice of appeal on questions of law and fact was filed by Mae Thomas Hrobon. Counsel for all parties stipulated that the matter on appeal may be heard and considered by this Court on the record taken in the Probate Court. This Court appointed a referee to consider the matter, who filed his report on January 2, 1951. To this report were filed the motions which are before this Court for determination.

A competent and reliable firm of accountants of Columbus, Keller, Kirschner, Martin and Olinger, was selected by the trustee to make a complete audit of his administration as executor of the Estate of Clay M. Thomas, and as trustee of the trust created by the testator. The report of the accountants covers the period from May 1, 1938 to August 31, 1946. The opening date of the accounting (May 1, 1938) was sixteen days after the date of the death of the testator, which occured on April 14, 1938; and the opening date of the accounting is one month prior to the date of the appointment of Harry B. Holmes as executor, which occurred on June 1, 1938. The closing date of the accounting of the executor was December 31, 1938. The closing date of the accounting of the trustee (August 31, 1946), is approximately one month prior to the date on which the trustee filed this action in the Probate Court. No accounting has been submitted to the Court by the accountants for the period subsequent to August 31, 1946, although some testimony was taken relative to certain transactions occurring at a later date. The report of the accountants consists of one hundred ninety-six pages in the form of a bound volume, which contains twenty-one separate exhibits and forty-five separate schedules. This report is referred to as "Plaintiff's Exhibit X," and gives a detailed statement of receipts and disbursements of the executor and trustee, the various appraisals of estate assets, income received and disbursed, real estate transactions conducted by the executor and trustee, the corpus of the trust,

income disbursed to the life tenant, purchases and expenditures made by the trustee in the operation of the laundry, and adjustments of the trustee's accounting to conform to what the accountant considered to be good accounting practice, and other related matters.

## PART II

On January 23, 1937, Clay M. Thomas, a resident of Columbus, executed his last will and testament, the pertinent part being as follows:

### "ITEM I.

"I direct that all my just debts and funeral expenses be paid out of my estate as soon as practicable after the time of my decease.

### "ITEM II.

"I give and bequeath to my sister, Clara J. Thomas Mann, the sum of $15,000.00, the same to be paid to her by my said executor and trustee at the rate of $100.00 per month; but in the event that my said executor or trustee should deem it necessary and convenient to pay to her more than $100.00 per month, he shall so do.

### "ITEM III.

"I give and bequeath to my sister, Millie K. Thomas Watson, the sum of $15,000.00, the same to be paid to her by my said executor and trustee at the rate of $100.00 per month; but in the event that my said executor or trustee should deem it necessary and convenient to pay to her more than $100.00 per month, he shall so do.

### "ITEM IV.

"I give and bequeath to my brother, Ray G. Thomas, the sum of $15,000.00, the same to be paid to him by my said executor and trustee at the rate of $100.00 per month; but in the event that my said executor or trustee should deem it necessary and convenient to pay to him more than $100.00 per month, he shall so do.

"It is my wish that my said trustee, Harry B. Holmes, or his successor in the trust, shall hold, manage and control the bequests hereinbefore made in Items 2, 3, and 4, and that my said executor and trustee shall invest the said funds in government bonds or other securities of like nature as my trustee in his discretion may deem best, with the full power to pay to my sisters and brother the sum of $100.00 per month, to be applied on the amount of the bequests, and to pay such a sum over and above the $100.00 herein stipulated as in the discretion of my trustee may be necessary to provide a comfortable living for my said legatees hereinbefore referred to.

"In the event of the death of any of the legatees hereinbefore referred to, then his or her share shall be equally divided among my surviving sisters or brothers, or any of them, share and share alike.

"And in the event of the death of all of my sisters and brothers before my death, then it is my will that their shares shall revert to my wife.

"ITEM V.

"All the balance of my property, both real and personal, of every kind and description, wheresoever situated, which I may own or have the right to dispose of at the time of my decease, I give, bequeath and devise to my wife, Mae Thomas, in trust, for the benefit and the use of my wife, for and during her life; hereby directing my said trustee, Harry B. Holmes, to pay to her for her use and benefit all the income after the payment of operating expenses and taxes and other charges from my business at The Atlas Linen Laundry and Supply, or any other income that I may have after the payment of the other monthly legacies which I herebefore have set out, with full power granted to my said trustee to lease, transfer, or exchange any securities and property belonging to said trust fund for such prices and upon such terms and conditions as he may deem best, and for the best interests of my wife; to execute and deliver any proxies, powers of attorney, or agreements that the trustee may deem necessary or advisable in administering this trust; and also with full power to compound, compromise, settle and adjust, all claims and demands, in favor of or against the trust estate, upon such terms and conditions as he may deem best. Upon the death of my said wife, the said trust as herein created shall cease, and the trustee or his successor shall convey and transfer to my legal heirs the balance of the said property, share and share alike, at the time of the death of my said wife.

"I make, nominate, and appoint my attorney, Harry B. Holmes, of Columbus, Ohio, to be the executor and trustee of this, my last will and testament, with full power and authority to conduct and carry on the laundry business now conducted by me, and to do all things necessary or proper in the usual course of said business until such a time as the same can be sold, as a going business, for a price, which, in the opinion of my said executor, and in the opinion of my said wife, Mae Thomas, is a reasonable value thereof, and with full power and authority to sell and dispose of any or all of my estate, hereby authorizing and empowering my said executor to compound, compromise, settle and adjust all claims and demands in favor of or against my estate, and to sell, at private

or public sale, at such prices, and upon such terms of credit or otherwise, as he may deem best, the whole or any part of my real or personal property, and to execute, acknowledge, and deliver deeds and other proper instruments of conveyance thereof to the purchaser or purchasers. No purchaser from my said executor need see to the application of the purchase money to or for the purposes of the trust, but the receipt of my executor or trustee shall be a complete discharge and acquittance therefor."

On April 12, 1938 the testator executed a codicil to his will, the pertinent part being as follows:

"I, Clay M. Thomas, of the City of Columbus, County of Franklin, and State of Ohio, do make, publish and declare this codicil to my last will and testament.

"I hereby add the following, to be deemed and taken as if originally inserted in said will, I give and bequeath to Margaret Cassidy, of Columbus, Ohio, the sum of Ten Thousand ($10,000.00) Dollars, payable in monthly installments of One Hundred ($100.00) Dollars each, and the payment of the same is hereby made a charge upon my business, which is known as The Atlas Linen, Laundry and Supply, and located on Grant Avenue, Columbus, Ohio; and that the unpaid balance of the Ten Thousand ($10,000.00) Dollars is to draw interest at five per cent, the same to be included in the One Hundred ($100.00) Dollar monthly payments until the full sum of Ten Thousand ($10,000.00) Dollars together with interest is fully paid to the said Margaret Cassidy. This bequest is made in consideration of services and money advanced to me for the business by the said Margaret Cassidy, and I hereby instruct my said trustee, Harry B. Holmes, to pay to the said Margaret Cassidy the sum of One Hundred ($100.00) Dollars per month until the full settlement of Ten Thousand ($10,000.00) Dollars and interest is fully paid.

"I further authorize and empower my said trustee, Harry B. Holmes, in the exercise of his discretion, to carry on any and all business conducted by me at the time of my decease, or in which I may then be interested, whether alone or in partnership with others, and to continue the same for such time as, as in the judgment of the said trustee, shall be for the best interest of my estate, and to extend or renew any such relationships, or to terminate, as the trustee shall think fit, but it is my wish that the said trustee continue my Linen and Laundry business as long as the same may be profitable.

"I hereby ratify and confirm my said will in all other respects."

The will and codicil were duly probated. The widow, Mae Thomas (now Hrobon), elected to take under the will. Harry

B. Holmes was duly appointed executor and later as trustee, and is still acting as trustee.

## PART III.

The cardinal rule to follow in a will construction case is to ascertain the intention of the testator. This intention is determined from the words used in the will and codicil construed from the four corners. Extrinsic evidence is admissible for the purpose of assisting the Court in determining the intention of the testator. We recognize the established rule that the Court may admit extrinsic evidence in an effort to place the Court as nearly as possible in the position of the testator when he executed his will. Evidence of his family situation, business and financial circumstances, the nature and extent of his investments and the natural objects of his bounty, is admissible, where there is some doubt as to the meaning of the will. **Vol. 41 O. Jur. pages 624, 630** (cases cited). With this evidence the Court is better able to see things as the testator saw them and to construe the words used in the will as he understood them and to give that construction which was intended. But from the evidence adduced the Court cannot allow the natural import of the words used to be varied or contradicted or omissions supplied or apparent ambiguities removed by parol evidence. **Vol. 41 O. Jur., page 609, Section 447** (cases cited). Direct evidence as to the intention of the testator, or conversations between the testator and the scrivener are not generally admissible. Under the circumstances in this case conversations between the testator and Harry B. Holmes, the scrivener, were not admissible. **Vol. 41 O. Jur., page 635, Section 505** (cases cited). It is well settled that words used in a will are to be given their ordinary meaning, unless it appears from the context that the testator intended to use them in a different sense. While grammatical accuracy need not be observed, and more consideration is paid to substance than form, the construction of words used by the testator and the arrangement of sentences and the punctuation, sometimes does become important. **Vol. 41 O. Jur., page 638** (cases cited). Technical words used in a will should be given their technical meaning unless it appears that the testator used them in some other and different sense. **Vol. 41 O. Jur., page 642** (cases cited). In construing the will the Court should make every effort to give effect to every provision of the will and to reconcile any apparent inconsistencies.

There is no fixed rule applicable to the construction of wills. All rules of construction are useful or applicable only insofar as they aid in arriving at the correct construc-

tion as to the intention of the testator. **Vol. 41 O. Jur., pp. 575, 576** (cases cited). If the language of the will is plain and reasonably clear the Court cannot qualify or control the language by conjecture or doubt arising from extraneous evidence. **Vol. 41 O. Jur., page 599** (cases cited).

PART IV.

The referee found from the evidence admitted that Clay M. Thomas and Mae Thomas, upon his return from service in World War I, started a linen supply business in a building at the rear of the Thomas home property on Hunter Avenue, Columbus, Ohio. The business grew and in the year 1922 they moved to Maple Street. Within a year or two Thomas purchased land on Grant Avenue just south of Spring Street in Columbus, Ohio, and on the rear of this lot he constructed a two-story building and a boiler room. The following ·year a two-story addition was put on the front of the same lot. Between 1929 and 1931 the four-story building with a boiler room was constructed in the rear. These buildings on Grant Avenue, as erected through the years 1929, and 1931, comprise the present structures of The Atlas Linen, Laundry and Supply. In the beginning the principal business of The Atlas Linen, Laundry and Supply was linen and towel supply. Thomas bought napkins, towels, aprons, sheets, tablecloths, barber towels and other similar items for the purpose of renting them to barber shops, hotels, clubs, restaurants, doctors, dentists and other business institutions. These items were processed by washing and cleaning. Always a fresh supply in the hands of the customer, on a .rental basis, was the particular service of the linen supply business. In 1926 the business had progressed to a point where laundry processing was started. Thomas cleaned and washed wearing and household apparel which belonged to the customer and not owned by Thomas. In the meantime the industrial supply work was added. Thomas cleaned and washed uniforms, overalls and other work clothing used in such places as garages, factories and industrial workshops. In the main these garments were owned by Thomas. In 1934 he began manufacturing garments used in his industrial supply business and for that purpose organized The Atlas Garment Company. In 1936 Thomas purchased lots in the City of Columbus and the Village of Upper Arlington, Ohio, and started building houses thereon. He organized Clay M. Thomas, Inc., through which agency his construction work was conducted. On the date of his death (April 14, 1938), Thomas was operating The Atlas Linen, Laundry and Supply, which at that time included The Atlas Garment Company, and Clay M. Thomas, Inc., a construction company.

On May 1, 1938 the opening entry in the records of the executor shows that on the date of the testator's death his total assets were valued at $269,714.76. The assets are listed as follows: Cash, $11,479.83; Accounts Receivable $7,386.81; Inventories $20,847.16; Investments, including real estate, $156,209.69; Property and assets of laundry $73,191.27; Money advances $600.00. (See Plaintiff's Exhibit X, page 58, Exh. T) His liabilities amounted to $226,412.57. The liabilities are listed as follows: Accounts Payable $19,071.12; Check payable $5,000.00; Deposits on linen rentals $422.99; Mortgages payable $114,581.00; Accrued liabilities $22,337.46; Allowance for support of widow $10,000.00; Legacies payable $55,000.00. Exclusive of the legacies, the liabilities amount to $171,412.57. The difference between assets and liabilities of the testator at death was $98,302.19. (Plaintiff's Exhibit X, page 59, Exh. T) The net estate listed for determination of inheritance tax purposes was $89,764.90. The Federal Estate Tax appraisal increased the appraisal value of the real estate $61,410.00. (Plaintiff's Exhibit X, page 65, Schedule 2)

The total net income derived from rental property as shown by Plaintiff's Exhibit X, page 50, Exh. O, is as follows: From May 1, 1938 to December 31, 1938, $701.89. For the year 1939, $1008.83; 1940, $2,710.61; 1941, $1,961.79; 1942, $1,124.33; 1943, $1,508.08; 1944, $1,123.48; 1945, $881.77.

A short time prior to his death the testator entered the residential construction business. He purchased fifty lots in Upper Arlington for the purpose of constructing residences thereon for sale. On the date of his death he still owned thirty-six lots and on eight of these lots residences had been completed and were ready for sale. On a number of other lots houses had been started and were under construction. It was this real estate which was increased on the Federal Estate Tax appraisal.

This Court finds from the record that no children were born to Clay M. Thomas and Mae Thomas. His next of kin at the time of his death, and at the present time, consists of his two sisters and brother who, if living at the death of the life tenant, will receive the balance of the trust estate as his "legal heirs." The two sisters and brother are contingent remaindermen. The class of "legal heirs" cannot be ascertained until the death of the life tenant.

For the purpose of brevity and clarity the plaintiff-appellee is herein designated and referred to as trustee; the defendant-appellant, Mae Thomas Hrobon, the widow, is herein designated and referred to as the life tenant; and the sisters and brother are referred to as legatees; the unknown "legal heirs" as remaindermen.

We do not deem it necessary or practical to discuss or even state all the conflicting claims of the parties, or to discuss or even cite all the numerous authorities cited in briefs of counsel. To do so would unduly extend the opinion beyond that which is necessary to decide the issues presented.

PART V.

Rather than construe the will generally and then answer the questions propounded specifically, which would involve repetition, we now take up the questions propounded by the parties, and in the interest of clarity we follow the same order as did the referee.

TRUSTEE'S QUESTION NO. 1

"What is the meaning of the term 'income' as used by the testator in his will as the same appears in Item V of the will and codicil thereto."

The referee held that income payable to the life tenant should be arrived at by computing the gross income from the operation of the Atlas Plant and other income producing properties of the decedent; and deducting therefrom all operating costs recognized by the Internal Revenue Department of the United States for income tax purposes; also deducting all taxes of every kind and nature imposed by any public authority whatever; that in the operating costs of the Atlas Plant there should be included maintenance, **expansion necessary to keep pace with the increase or progress and continued operation of the business of the plant,** the cost of the management of the trust, including the trustee's compensation, court costs, fees of counsel necessarily incurred in the administration of the trust, **and the interpretation of the will, also expenses occasioned by litigation and other charges incurred under the supervision and control of the court;** also the monthly legacy payments to **Mann, Watson, Thomas** and Cassidy, until those legacies had been fully discharged. We disagree with the referee with respect to that part of the finding which is emphasized.

The will, in Item V, gives all the income from "all the balance of my property" to Mae Thomas for life, and with respect to the income from the laundry business defines income as follows: "All the income after the payment of operating expenses and taxes and other charges from my business at The Atlas Linen Laundry and Supply." The testator then provides that his wife shall receive "any other income that I may have after the payment of the other monthly legacies which I herebefore have set out."

With respect to income from property of the trust other than the laundry business such income is the "net income" after the payment of cost and expenses incident to the

administration of the trust, including taxes and other proper charges which are recognized by the Federal Income Tax authorities, and which may reasonably be allocated to this part of the income of the trust. On the net income derived from property other than the laundry business, the legacies payable to Mann, Watson and Thomas are definitely made a charge. The life tenant cannot receive any income from this portion of the trust property until these three legacies are paid in full. For this purpose it will be necessary to make a segregation of income.

The term "income," as it relates to the income from the laundry business, is more difficult to determine and is the principal question for determination by this Court. The parties in this proceeding have used the terms "gross income," "net income" and "distributable income." In Item V the testator provides that the life tenant shall receive the income from the business "after the payment of operating expenses and taxes and other charges from my business at The Atlas Linen Laundry and Supply." The determination of the meaning of the term "income" is arrived at by determining what deductions may properly be taken from gross income of the laundry business. The testator stated that operating expenses may be deducted. We accept and approve the finding of the referee that operating expenses embrace those expenses recognized by the Internal Revenue Department of the United States for income purposes, including maintenance of the plant. The testator also provided that taxes should be deducted. We approve the finding of the referee that all taxes of every kind and nature imposed by any public authority should be deducted.

The question propounded cannot be answered fully without considering the words of the testator to the effect that from the income should be deducted not only operating expenses and taxes, but also "other charges." This matter is treated by the referee in the answer to trustee's question number two, which is as follows:

"What is the meaning of the clause 'operating expenses and taxes and other charges from my business at the Atlas Linen, Laundry and Supply' as the same appears in Item V of the testator's will; and what sums, if any, expended by the trustee in that business may not be charged to 'income'?"

Questions numbered two, three and seven propounded by the life tenant raise the same issues as are raised by the trustee in question number two.

The referee answered trustee's question numbered two by concluding that these words used in Item V of testator's will "mean operating costs, recognized by the Internal

Revenue Department of the United States for income tax purposes; all taxes of every kind and nature imposed by any public authority; all costs for Atlas Plant maintenance and management, and **business expansion necessary to keep pace with the increase or progress and continued operation of the business,** including the costs of linens in use known as 'float,' **the cost of businesses purchased,** new machinery, repairs to machinery, equipment and laundry property, and such other costs and charges as the trustee, in his discretion, as a prudent business man, might deem necessary for the continued profitable operation of the Atlas Plant, and administrative costs **including expenses incident to litigation."** We disagree with the referee with respect to that part of the finding which is emphasized.

The words in the will, the meaning of which is in dispute, are "other charges." The life tenant contends that the rule of ejusdem generis applies, restricting the meaning of the term to items of expense similar to operating expenses and taxes. We do not believe that the testator intended to give these words such a restricted meaning.

The trustee and remaindermen contend that the words "other charges" should be given a broad meaning because of the broad powers conferred on the trustee. Attention is called to the provision in Item VI of the will wherein the testator gave to the trustee "full power and authority to conduct and carry on the laundry business now conducted by me, and to do all things necessary or proper in the usual course of said business until such a time as the same can be sold," and also the provision in the codicil wherein the testator provides "I further authorize and empower my said trustee, Harry B. Holmes, in the exercise of his discretion, to carry on any and all businesses conducted by me at the time of my decease. * * * It is my wish that the said trustee continue my linen and laundry business as long as the same may be profitable." The trustee and the remaindermen contend, and the referee finds, that the powers thus conferred authorized the trustee to conduct the laundry business in the same manner as if it were his own enterprise. It is asserted that the trustee, by the provisions of the will and codicil, is given sufficient power and authority which would authorize him to use his discretion and best judgment in determining whether any of the income from the business should be used for expansion purposes, such as purchasing competing businesses, purchasing additional land and additional machinery for such expanded business, in order that the laundry business "may be profitable." In other words, the trustee interpreted the will, and the referee agreed, that it was the intention

of the testator that the trustee could do anything necessary to operate successfully. Record, P. 917. We do not agree. The testator had in mind that the trustee may not be able to operate the business profitably and so provided for the sale of the business.

We recognize that in operating a business, such as a laundry business, it would be advisable to confer wide discretionary power on the trustee in determining whether a certain given expense, such as money expended for the purchase of competing businesses and for additional land and machinery for the operation of the expanded business, would be for the best interests of the trust. However, unless the provisions of the will expressly provide that the trustee shall have such wide discretionary power to take income, which would otherwise be distributed to the life tenant, and to use it for such purpose, the trustee has no authority to make such expenditures. Authority to operate does not confer power on trustee to allocate the costs of replacements and additions to the detriment of the life tenant and benefit of the remaindermen.

After giving consideration to all the provisions of the will we find that a scheme was devised by the testator for the liquidation of the settlement of his estate and the continuation of his business for the purpose of providing an income for his widow for and during her natural life. It appears that she was the primary object of his bounty. We find no provision in the will which would permit a construction that it was the intention of the testator that the trustee in the operation of the laundry business could deprive the life tenant of a portion of her income to expand business, thereby increasing the corpus at her expense. The testator is charged with the knowledge that the trustee must protect and defend the corpus as against the life tenant and, likewise, must protect and defend the income of the life tenant and make distribution to her of all income to which she is entitled, and that no part of the income of the life tenant may be taken to increase the corpus. Scott on Trusts, Vol. 2, Sec. 232, P. 1257.

In Item VI the testator did not confer power on the trustee to take the income of the life tenant for the purpose of buying competing businesses and additional assets which would become a part of the corpus by conferring on the trustee "full power and authority to conduct and carry on the laundry business now conducted by me, and to do all things necessary or proper in the usual course of said business until such a time as the same can be sold." These words confer full power and authority on the trustee to carry on the laundry

business as he received it in the trust; and in the operation of the business as he received it he was given full power and authority "to do all things necessary or proper in the conduct of said business" having in mind that he must serve with equal devotion the rights of the remaindermen and the life tenant. In our opinion "other charges" must be limited to charges or expenses chargeable to the business when operated within the limits of the powers conferred upon the trustee.

To the claim that the testator intended the term "other charges" to include only the expenses of administering the trust, such as trustee's compensation, counsel fees, cost of bond, other costs such as court costs, etc., the trustee and remaindermen assert that these expenses are determined under the law and that the testator must have attached some other significance to these words. It is claimed that in determining net income from a business operating costs and taxes also are always deducted, and by the same process of reasoning the testator must have intended, in the use of these words, to give this expression an additional significance. We do not believe that this reasoning is sound. In our opinion the testator intended to give the words "operating expenses," "taxes," and "other charges" the ordinary and primary meaning of the words. It appears that the term "other charges" was a catch-all and intended to include expenses of administering the trust and also expenses of ordinary operation of the business under the trust of a non-recurring nature, which would not properly fall in the category of operating expenses and taxes. See **Morris v. Harris, 19 Oh St 15, 19.** The accountant listed separately non-recurring expenses.

In the use of the words "other charges" the testator did not intend to include the payment of the three legacies mentioned in Items II, III and IV of the will. To so interpret the will would require the Court to rewrite the will and make the payment of these three legacies a charge on the income from the laundry, when the testator definitely made these legacies a charge on income from property in the trust other than the laundry business.

We conclude that income, as used by the testator in Item V of the will, means "net income" of the business and the trust as operated under the will. We do not use the term "net income" in a technical sense, but use this term to designate that income which results from the operation of the business and the trust which is "ascertained by subtracting expenditures allocable to income from receipts allocable to income." Scott on Trusts, paragraph 233, P. 1258;

see Restatement of the Law, Trusts, Vol. 1, Section 233, P. 681.

We do not use the term "net income" in the same technical sense as it is used by the Internal Revenue Department, although it is the opinion of this Court that had the trustee only made such expenditures as are permitted under the will the net income to which the life tenant was entitled in any current year would have closely approximated the net income as determined by the Internal Revenue Department.

From the net income must be deducted the payments on the Cassidy legacy. The referee used the term "distributable income" to designate the amount which is finally payable to the life tenant. We find no objection to the use of this term. The particular term used is not important. The important thing is the method employed to arrive at the amount finally payable to the life tenant.

We now apply the principle herein announced to several controversial matters in which the trustee expended from the income substantial sums of money in the conduct of the laundry business.

### a. Cost of Linens—Float.

The referee found that "float" is a term used to denote linens and garments in use; that is, in the hands of customers, in trucks, and at the Atlas Plant being laundered. The life of these linens and garments, according to the evidence, is considerably less than one year. The referee properly found from the evidence that "float" is expensed as soon as it is put into use, and appears as an "operating expense" on the statement of income. The referee also found that the testator in the operation of the laundry business and in his income tax returns followed the policy of expensing float as of the date it went into use, and that the trustee, upon assuming charge of the trust, followed the same policy. To be more specific, the trustee charged cost of linen, linen equipment and industrial supplies to expense at the time that they were removed from stock and put into service. The evidence shows that float is one hundred per cent depreciated within a couple of months after put into use.

The referee found that the trustee in removing float from the inventory account and expensing it as an operating cost, adopted the method of accounting recognized and approved by the Bureau of Internal Revenue, the accounting profession and the method of accounting recognized and approved by the testator.

The increase in the value of material in stock, and also the material in use, known as float, was largely due to the persistent effort on the part of the trustee to expand the

business and particularly in the purchase of like competing businesses. By purchasing competing businesses a corresponding expansion in the Atlas business resulted and this is reflected in receipts and disbursements and also in inventory values of such material in stock as shown by Plaintiff's Exhibit X, Page 126, Schedule 25. The total inventory value of the linen and industrial division of the laundry business on May 1, 1938 was $13,996.44. This amount was greatly increased during the years 1939, 1940, 1941, 1942 and 1943. There was a substantial decrease in 1944. However, in 1945 there was a substantial increase so that the inventory value at the end of that year was $42,042.71. It was in 1945 when the trustee purchased two competing businesses and paid therefor $100,000.00 out of income. In August, 1946, the inventory value of this material was $93,783.43. It is therefore obvious that the purchase of competing businesses, which will be treated later under an additional heading, resulted in the expansion of the business and necessitated the purchase of additional machinery, additional trucks, additional supplies, and resulted in a tremendous increase in the amount and value of float.

The yearly cost of the material which was put into float was tremendously increased in each succeeding year as shown by Plaintiff's Exhibit X, page 24—Exh. A, Schedule 5. From May 1, 1938, to December 31, 1938, there was expended for such material $39,897.53. For the entire year of 1939, $61,955.43. Each succeeding year an increased amount was expended so that in 1944 $190,041.84 was thus expended. From January 1 to August 31, 1946, there was thus expended $199,289.70, or a total for the period from May 1, 1938 to August 31, 1946 of $1,142,494.40. All of the cost of float was paid from income.

It is the contention of the trustee and the legatees that the life tenant was the direct beneficiary of this expansion of the business and this manner of operation for the reason that her income increased corresponding each succeeding year. The life tenant contends that since the material in stock and float has been tremendously increased in value a credit should be given the life tenant at this time for the increased inventory value of the material on hand and for float over and above the inventory value for such material and float at the beginning of the trust. If this were done the effect would be to permit the life tenant to receive the income from the use of float in the business and, also, a credit for the estimated value of float at the end of the accounting period. We cannot accept this view of the matter, since it is the fact that linens, etc., are totally consumed and depreciated

within a few months after being taken out of stock and put into use, and that it is the accepted practice to expense linens, etc., as soon as such material is taken from stock and put into use.

The life tenant has received and now claims the income derived from the use of float in the business. In order to keep the business operating on a high level of income, the trustee must annually expend large sums for material which goes into stock. The purchase of such material is properly charged to income. The increased cost of material going into stock in turn produces an increase in net income distributable to the life tenant.

We are in accord with the contention of the life tenant to the extent that the trustee should not be permitted to gradually build up the inventory of such material during the conduct of the trust and charge it to income and at the termination of the trust regard such material in inventory and float as corpus. In respect to float we fail to find any injustice resulting to the life tenant during the continuation of the trust. It is upon the termination of the trust that an adjusment must be made, otherwise the remaindermen would be unjustly enriched at the expense of the life tenant. Then, too, in the event of the sale of the business material in inventory and in float would be a substantial item in determining the value of the business. It would be at that juncture in the relationship of the parties that an adjustment would be required.

The formula used by the Ohio Department of Taxation Intangible Tax Division, seems to be fair and just. Record, P. 1850, et seq. For the purpose of determining the value of material in stock and in float, i. e., in use, the Department of Taxation takes the value of inventory in the beginning of the year and adds to it the cost of all purchases made during the year and subtracts from this total the value of inventory at the end of the year. Seventy per cent of this figure would be the fair value of material in stock and in use at the end of the year. This formula was adopted by the Department of Taxation after much research and after the matter had been given intensive study. Since the date on which the trust will be terminated is unknown and uncertain, or, in the event of sale, the Court instructs the trustee to set up the books and apply the formula above stated so that at the close of each accounting period the rights of the life tenant and remaindermen will be reflected in regard to material in inventory and in use. Upon the termination of the trust or in event of sale by applying this formula, we arrive at a figure which will represent the value of material in stock

and in float at that date, over and above the value of material in stock and in float at the beginning of the trust, from which the life tenant will no longer derive any use or benefit in the way of income. This figure at the end, whatever it may be, will be credited to income and not corpus.

### b. Expansion—businesses purchased

The referee found from the record that from January 18, 1940 to and including the 19th day of May, 1945, the trustee purchased five similar competing businesses. The total costs of purchase of the several businesses were paid out of the gross income of the trust. The trustee contends that since the will placed no limitation upon the trustee respecting the purchase of new businesses that, therefore, the trustee may do so. This Court holds to the proposition that the trustee has not the power to purchase new businesses unless the will expressly confers the power on him to do so. "Full power and authority to conduct and carry on the laundry business," and "to do all things necessary or proper in the usual course of said business," which was the power conferred on the trustee in the will, does not authorize him to purchase new businesses. To do "all things necessary" means to do all things necessary as trustee and not as sole proprietor. The direction to the trustee in the codicil to continue the business "as long as the same may be profitable" does not authorize the trustee to do anything and everything to make the business profitable as he would do if it were operated by him as sole proprietor. The trustee does not have authority conferred on him to conduct the business as a private individual may do to make the business profitable. A private individual may use income to expand at will; a trustee may not unless authority is clearly given.

But it is claimed that the life tenant consented to the purchase of other businesses by the trustee. The record does not show that the trustee discussed with the life tenant the purchase of the first three businesses. The record does show that a conference took place between the trustee and the life tenant respecting the purchase of The 5c Towel and Supply business and The Bowden Towel and Supply Company. The trustee testified that the life tenant said: "I think that will be all right." The life tenant testified that in response she said "I told him I didn't know." She further testified that he did not advise or consult with her or give her any information relative to these two businesses. However, it does appear that an application was filed in the Probate Court by the trustee to purchase The 5c Towel and Supply business and The Bowden Towel and Supply Company. The Court in an ex parte order granted the application. The life tenant had no notice and such order would not be binding on her

134

The referee accepted the testimony of the trustee on this issue and disbelieved the testimony of the life tenant. On the basis of the testimony of the trustee there is no showing that the life tenant gave her approval of the purchase of such businesses and to charge the cost to income. The trustee does not claim that the matter of the allocation of the cost was discussed with the life tenant. The record is silent on this matter. Then, too, the matter of purchasing competing businesses concerns not only the life tenant but the remaindermen as well.

It is claimed that the life tenant should not be heard to object inasmuch as her income has greatly increased by such purchases. Whether or not the trustee has exceeded his powers is not determined by the success or failure of the venture. Fortunately in this case the trustee has shown a genius in the operation and conduct of a laundry business and has been exceedingly successful. It might have been otherwise. A trustee is not permitted to test his managerial skill and business ingenuity by embarking on a venture of expansion which requires the use of income of the life tenant in the purchase of competing businesses which may or may not prove to be profitable. The trustee cannot thus speculate with the income of the life tenant. Bogert on Trusts and Trustees, Vol. 3, Pt. 2, Sec. 601, Page 131.

This situation presents two questions: First, the power and authority of the trustee under the will to make the purchases. On this issue we conclude that the trustee exceeded his powers in the purchase of these businesses. Second, the trustee, having made the purchases, against whom should the cost be charged? The life tenant has received and now claims the income derived from such assets. The question now is one of the proper allocation of the cost of the businesses as between the life tenant and remaindermen.

The physical assets received through these purchases fall in the category of additional equipment and machinery purchased by the trustee. The physical assets received by the trustee, such as trucks, machinery, etc., should be charged to corpus in the same manner as any other additional equipment and machinery, and depreciated over a period of years in the same manner; the life tenant to be charged annually for depreciation during the life of such assets. The difference between the value of the physical assets and the purchase price is the amount paid for good will and becomes a part of and should be charged to corpus. This method of accounting is discussed more fully under the next sub-heading.

c—Replacements—Additions Laundry Building

It is conceded that repairs to machinery, equipment and buildings are properly charged to income.

The referee found from the record that between May 1, 1938 and August 31, 1946, new property assets, such as machinery and equipment, were purchased during this period at a total cost of $201,883.33, of which amount $140,091.20 was for replacements and $61,792.13 was for additions. The purchase price of these various property assets was deducted from the net income as "other charges" in the year purchased, so that the distributable income to the life tenant was reduced over this period by reason of the cost of these property assets. The referee further found that in each year the amount of depreciation on the items so purchased was credited to net income in determining the distributable income to the life tenant; that during this period these credits amounted to $39,823.18 for replacements and $18,163.25 for additions, or a total of $57,986.43. The difference between the latter figure and $201,883.33, the total cost of such assets so purchased up to the year of 1946, will be credited back to net income of the life tenant in succeeding years so that by 1955 the total depreciation credits will equal the amount of the cost of the assets.

The trustee and the legatees contend that although the corpus, at the beginning, was valued at $79,000.00 the corpus is still $79,000.00 and that the increased value of the business represents an increase in assets but does not represent an increase in the value of the corpus of the trust. We cannot accept this view of the situation. It is further contended that the difference between the original value of the corpus, $79,000.00, and the present value of the entire business, is to a great extent represented by depreciation credits due the life tenant by reason of the purchase of replacements of machinery and the purchase of additional assets. It is further contended that in the event of the death of the life tenant at a time prior to the receiving by the life tenant of all of such depreciation credits there will be due her estate the balance of such depreciation credits. In other words, the life tenant, during her life, will have her income reduced during any current calendar year by deducting from the income the total purchase price of replacements and additional assets during the year of purchase; and the life tenant will then be credited each succeeding year with a depreciation credit during the life of such machinery or assets. This method of operation of the trust, and this system of accounting of charges and credits forces the life tenant to finance the operation of the business out of her income from year to year, and because of the increase of the business and the expansion of the business by the trustee from year to year, the life tenant is required to forego each succeeding year a

larger share of her income; so that at no time during the operation of the trust would she receive the total amount of income due her for any current year. As a result there would be from year to year an increasing total amount of depreciation credits due her. It is contended by the remaindermen that at her death her estate could make claim against the trust for the total amount of such depreciation credits due her.

The life tenant is not interested in depreciation credits. The life tenant is entitled to receive each calendar year the net income from the Atlas business after deducting operating expenses, taxes and other charges as defined by this Court. If some of the assets which are considered to be corpus are replaced the cost is charged to the corpus and a depreciation charge should be made against the income of the life tenant for each year during the life of such replacement. The same is true with respect to additions which depreciate through use and produce income. In Restatement of the Law, Trusts, Vol. I, Section 233, Note 1, page 688, the author states this principle of law as follows:

"If the improvements are not permanent in character but the probable life of the improvements is limited in duration, although the cost of the improvements is payable out of principal, the trustee is under a duty to the beneficiary entitled in remainder to amortize the cost of such improvements out of income, in accordance with such reasonable plan as he may adopt (compare Section 239). The result is that if the trust does not terminate before the end of the probable life of the improvements, the whole cost of the improvements will be paid out of income. This is fair because the beneficiary entitled to the income gets the full benefit of the improvements and the remainderman gets no benefit. On the other hand, if the trust terminates prior to the end of the probable life of the improvements, the payments from income will cease on the termination of the trust. This is fair because the beneficiary entitled to the income has not received the full benefit from the improvements but the remainderman receives a part of the benefit."

In Scott on Trusts, Vol. II, Section 233.3, PP. 1265, 1266, it is stated:

"Where, however, the improvements are not of a permanent nature, especially where the probability is that they will not last longer than the probable duration of the trust, a . further adjustment has to be made in order to treat both life beneficiary and remainderman fairly. In such a case the investment will be treated as a wasting investment, and the trustee is under a duty to the beneficiary who is

entitled to the principal to make provision for amortization. He must deduct from the income each year enough to amortize the cost of the improvement. Thus if the trustee makes improvements upon the trust property which will probably last for twenty years, he should pay for the improvements out of the principal and deduct each year approximately one-twentieth of the cost. This method of adjusting the cost between life beneficiary and remainderman is obviously the fairest method. It avoids the necessity of speculating upon the probable duration of the trust and deducting immediately, a gross sum from the income for the whole period. It results in an equalization of the income from year to year instead of the deduction of a large amount all in one year. If the life beneficiary lives as long as the probable duration of the improvements, he will ultimately have paid for the improvements, which is just because in that case the remainderman ordinarily will have no advantage from the improvements. On the other hand, if the life beneficiary dies within a short time after the improvements are made, he pays for no more than the actual enjoyment he has had and the remainderman who profits in that case pays the balance of the cost.

In the absence of special circumstances therefore all permanent improvements are paid for out of principal. Improvements which are not permanent but are reasonably expected to last only for a limited time are paid for out of principal, but are gradually amortized out of income if the trust lasts for a sufficiently long time. Ordinary repairs, on the other hand, are to be treated as annual expenses and are paid for wholly out of income. In the case of unusual repairs, however, it is proper for the trustee to spread the payment over more than one year. Thus he can make the payment out of principal and amortize as in the case of improvements."

We find this method to be the modern trend and it appeals to this Court as the fairest method. See Mulcahy v. Johnson, 80 Colo. 499, 252 P. 816; In Re Adler, 164 Misc. 544, 299 N. Y. S. 542; In Re Del Drago's Estate, 179 Misc. 383, 36 N. Y. S. 2d 811; Estate of Roberts, 27 Cal. (2d) 70, 162 P. (2d) 461; In Re Sellers' Estate (Del. Ch.) 67, A. (2d) 860; Matter of Davies,' 197 Mics. 827, 96 N. Y. S. 2d 191, 199, 200. See also **Lamb v. Lehmann, 110 Oh St 59, 65, 143 N. E. 276.**

The annual charge for depreciation should be computed by dividing the cost of the article by the number of years of its life's expectancy in use.

In our opinion the trustee had the power to make replacements. We accord the trustee the power and authority under

the will to replace old and worn out machinery and equipment with machinery and equipment of modern design which increased the efficiency of the plant—such as washers, ironers, extractors, heaters, tumblers, presses, trucks, etc. However, he has no power to purchase additions, such as competing businesses, additional real estate, etc. Such additions become a part of the corpus and increase the value thereof. We accord the trustee the power and authority to purchase additional machinery and equipment to take care of the normal increase brought about through skillful management. Both the life tenant and remaindermen are entitled to the benefit of the normal increase of trust business. Beyond this the trustee may not go.

However, the life tenant has received and now claims the income derived from the use of certain additions which depreciate through use and produce income. It thus becomes a question between the life tenant and remaindermen in making the proper charge and giving the proper credit. The act is done, and the additions have become a part of the business from which income is derived, received and claimed. The question now presented is one of proper allocation of charges and credits. In our opinion the purchase of all additions operates to increase the value of the corpus and should be regarded as corpus. A proper depreciation charge should be made annually against the income during the life of such assets as will depreciate through use.

#### d. Taxes

The referee found that the testator meant the word "taxes" to include every kind and nature imposed by any public authority whatever and that such taxes are to be charged against gross income. We approve the finding of the referee.

#### e. Release of claims and demands—Louis A. Voisinet

The referee found from the record that Louis A. Voisinet had a substantial interest in the garment division of the Atlas Company, which arose by reason of an agreement between Clay Thomas and Voisinet in 1934 when Clay Thomas took Voisinet into the business and started manufacturing garments used in his industrial supply business. The will gave the trustee full power and authority to settle the Voisinet claim and inasmuch as the claim was upon the earnings of the trust operation the settlement was properly chargeable against the income. We approve the finding of the referee.

#### f. Boiler loss

A boiler at the Atlas Plant was destroyed. The claim was made against a casualty insurance company for the loss, which the insurance company refused to pay. Litigation en-

sued, which resulted adversely for the trustee. The loss was charged as an operating expense. To this the life tenant objects. The referee found that the boiler loss was properly deductible from gross income. We approve the finding of the referee.

### g. Federal Income Tax

The life tenant claims she is "entitled" to be paid the sum of $8,930.72 for Federal Income Tax paid by the trustee on income not distributed to her. The trustee and the bookkeeper, Mr. Landgrave, each year prepared the income tax return for the life tenant. The net income for income tax purposes greatly exceeded the amount of income actually distributed to the life tenant for the corresponding current year. The life tenant now makes the claim for this over payment. The referee found that since taxes are charged against gross income he could make no finding in favor of the life tenant.

In our opinion the income of the life tenant, when proper adjustments are made by the accountant, will closely approximate the net income determined for Federal Income Tax purposes. We make no finding in favor of the life tenant for this item.

### h. Real Estate Purchased

The record shows that the trustee purchased several lots across the street from the laundry upon which he proposed to build a garage to house the trucks and to use as a repair shop. Plans were drawn at considerable cost. The cost of the real estate and plans was paid out of income. The trustee had no authority to make the purchase in the first place, much less charge the cost to income. The real estate and plans for the building are corpus. The cost is charged to corpus and no depreciation can be charged to the life tenant.

### Trustee's Question No. 3.

"If any of the expenditures set forth in the eighth paragraph of this amended petition were not properly chargeable against income under the provisions of said will and codicil, is the defendant, Mae Thomas Hrobon, estopped by her knowledge of, acquiescence in or consent to, such expenditures herein properly chargeable against the income of the trust?"

The referee found that the doctrine of estoppel applied.

In Case No. 4302, decided by this Court on February 23, 1950, this Court affirmed the judgment of the Probate Court in refusing the application of the life tenant to remove the trustee. It is contended that this Court, in the removal proceeding, found that the life tenant had full information as

to all purchases made by the trustee. A reference to our opinion does not disclose that this Court made such finding. In that case we did find that there was no neglect of duty or incompetency on the part of the trustee; that the operation of the trust showed skillful management and that there was no fraudulent conduct shown. We affirm our judgment on these matters. Our judgment in that case does not constitute res judicata since the issues in the two proceedings are entirely different.

The trustee in this proceeding is not charged with bad faith. It is contended that the trustee misinterpreted the will. What his powers were under the will and codicil were uncertain. The trustee himself was in doubt, as the allegations in his petition in this proceeding indicate. The life tenant testified that from time to time as she inquired of the trustee and the bookkeeper, Mr. Landgrave, when she would receive the balance of her income, they would answer that it would be paid when they would "get around to it." At one time the record shows that the trustee said: "When we get around to it; we are a little short." Record, page 2232. The record does not show at any time that the trustee or the bookkeeper told the life tenant that she had no additional income due her, which she claimed. The bookkeeper testified that he told the trustee and the life tenant that there were several matters which the Court would have to settle. Record, page 722.

It is pointed out that the trustee from time to time made application to the Probate Court for authority to do certain things in the conduct of the trust. With the exception of the application for authorization to borrow $100,000 no notice was given to the life tenant and no hearing was had. Insofar as the record shows the life tenant had no knowledge of such applications and orders. Even though the Probate Court has the power to control the conduct of trustees under §10501-53 GC, such ex parte orders without notice were not binding upon the life tenant. **McMahon v. Ambach & Co., 79 Oh St 103, 86 N. E. 512; In Re Estate of Kachelmacher, 40 Oh Ap 282, 178 N. E. 314.**

The record shows that the trustee filed his reports as trustee in the Probate Court and that after some insistence on the part of the life tenant copies of such reports were furnished her. These reports do not indicate the method pursued by the trustee in the operation of the business and the accounting system which was used by the trustee in determining the income due the life tenant. The bookkeeper testified: "In our reports to the Court we never told what may have been or may not have been due to the life tenant

on our records, we didn't know what that amount might be and so set it up as net profit—net worth and undistributed income, we never determined it." Record, page 724. On page 957 the trustee testified that he did not know what constituted corpus. No question was ever raised by any of the parties to this proceeding, or by the Court, with respect to these reports. The approval of the reports by the Probate Court does not deprive the life tenant of the right to raise every question presented in this proceeding. The issue is largely between the life tenant and the remaindermen.

Whether the life tenant is estopped to make certain claims respecting the conduct of the trust does not affect the Court's interpretation of the will. The question of estoppel has nothing to do with the will construction.

The record is clear that the life tenant reposed implicit confidence in the trustee and the bookkeeper. After the death of her husband she looked to Judge Holmes, the executor and trustee, for advice and counsel. She had no independent counsel. Her trustee was in a dominant fiduciary position.

Estoppel does not apply unless the party against whom it is to operate had full knowledge of all the facts and his rights under the law. **In re Trusteeship of Stone, 138 Oh St 293, 34 N. E. (2d) 755.** The application of the doctrine of estoppel becomes necessary to protect the person relying on words or conduct from damage or an injurious change of position by reason of the conduct or words of another. Estoppel is intended to prevent a wrong to an innocent party. In the instant case the record does not show that the trustee, or any other interestd party, at any time relied on the conduct of the life tenant. Rather the life tenant relied on the conduct and judgment of the trustee.

There is a distinction between estoppel, acquiescence and ratification. **Vol. 16 O. Jur. page 586, et seq.** The substance of estoppel is the inducement of another to act to his prejudice; acquiescence embraces all the elements of estoppel and assent to the act or conduct with full knowledge; the substance of ratification is confirmation after the act with full knowledge. On page 590, et seq., the term "acquiescence" and the term "ratification" are discussed. On page 591 the author states:

"Both acquiescence and ratification are frequently spoken of as estoppel but, strictly speaking, neither can be more than part of an estoppel at best. An estoppel is a legal consequence, a right, arising from acts or conduct, while acquiescence and ratification are but facts presupposing a situation incomplete in its legal aspects, i. e., not as yet

attended with full legal consequences. The most that acquiescence or ratification can do, is to supply an element necessary to the estoppel and otherwise wanting, such as knowledge of the fact at the time of making the misrepresentation. Each, however, stands upon its own ground and must be made out in its own way, not necessarily in the way required by the ordinary estoppel by conduct. Estoppel proceeds on the theory that the party's conduct has induced his adversary to take certain action on the faith of it, and that it would work injury to his adversary if the party were not compelled to be bound by such conduct. This element of knowledge and reliance upon the part of the adversary may not be present in ratification."

In **Trust Company v. Stevenson, 114 Oh St page 1,** 150 N. E. 726, the Court, on page 14 held:

"Of course, in technical estoppel, the party to be estopped must knowingly have acted so as to mislead his adversary, and the adversary must have placed reliance on the action, and acted as he would otherwise not have done. Some authorities, however, hold that what is tantamount to estoppel may arise without this reliance on the part of the adversary, and this is called ratification, or election by acceptance of benefits, which arises when a party, knowing that he is not bound by a defective proceeding, and is free to repudiate it if he will, upon knowledge, and while under no disability, chooses to adopt such defective proceeding as his own. Such conduct amounts to a ratification. Estoppel proceeds on the theory that the party's conduct has induced his adversary to take certain action on the faith of it, and that it would work injury to his adversary if the party were not compelled to be bound by such conduct. This element of knowledge and reliance upon the part of the adversary may not be present in ratification. Ratification means that one under no disability voluntarily adopts and gives sanction to some unauthorized act or defective proceeding, which without his sanction would not be binding on him. It is this voluntary choice, knowingly made, which amounts to a ratification of what was theretofore unauthorized, and becomes the authorized act of the party so making the ratification."

The distinguishing feature of acquiescence is that the party against whom it is asserted affirms or approves the transaction at the time it is done. Acquiescence does not arise by merely neglecting to assert his rights. In **Vol. 16 O. Jur. page 611,** the statement of the author is as follows:

"As was there pointed out, acquiescence, as the term is used in connection with estoppel, means something more than merely neglecting to assert one's rights. There must be

joined with it, before it will operate to deprive a person of his legal rights, all the essential elements of an estoppel."

Again in **Vol. 16 O. Jur. Section 54, page 611,** the author in discussing the "Acceptance of Benefits" doctrine states:

"The acceptance of benefits from a transaction, contract, instrument or statute may give rise to an estoppel to question its validity or to take advantage of any irregularity in connection therewith, at least where the one accepting such benefits does so with full knowledge of the facts and of his rights. **It has been held, however, that no estoppel arises from the mere acceptance of benefits in the absence of such knowledge.**" (Cases cited.) (Emphasis ours.)

See Hampshire County Trust Co. v. Stevenson, supra. See also Vol. 31 C. J. S. PP. 341, 349; Vol. 19 Am. Jur. PP. 676, 682, 690.

With the exception of the purchase of The 5c Towel and Supply Company and The Bowden Towel and Supply Company there is no evidence whatever that the life tenant was consulted, approved, consented or acquiesced with respect to any action of the trustee in the conduct of the trust and, more specifically, in transactions involving the expenditure of income of the life tenant in the purchase of replacements, additional assets and additional businesses. We have already discussed the transaction relative to the purchase of The 5c Towel and Supply Company and The Bowden Towel & Supply Company, and after scrutinizing the record closely we find no evidence with respect to this transaction that the life tenant had full knowledge of the facts and her rights, approved or consented to the transaction or acquiesced in the purchase of the businesses and the payment therefor out of income. But conceding that the life tenant did have knowledge of the purchase of The 5c Towel and Supply Company and The Bowden Towel and Supply Company, and participated in it, such knowledge and acquiescence would not affect the allocation of cost. On this matter the record is silent.

In our judgment there is no evidence in the record which would justify a finding that the life tenant was estopped by reason of any act or conduct on her part prior to the institution of this action. However, ratification by the acceptance of benefits may operate and be effectual at any time after the act.

After this action was instituted and after she employed counsel to make defense to the action and was apprised of her rights, both in the lower Court and in this Court, the life tenant claims the income derived from all the activities of the trustee in the conduct of the trust, i. e.,

income derived from purchase of competing businesses, purchase of additional machinery and equipment, the cost of which is charged to corpus. In our opinion the life tenant by pursuing the course of action has ratified the acts of the trustee by the acceptance of benefits. Thus, the life tenant is now estopped by the application of the "ratification by the acceptance of benefits" doctrine, to raise any question regarding any unauthorized purchase by the trustee. This is sometimes spoken of as the "quasi estoppel doctrine." However, the life tenant is not estopped to raise the question as to the proper allocation of the cost of such purchases, whether to income or corpus, and the method employed by the trustee in making charges and giving credit therefor. To this extent the finding of the referee will be modified.

Trustee's Questions Numbered 4, 5 and 6.

These questions have been withdrawn by the trustee and no party to this proceeding has requested an answer.

Trustee's Question No. 7 (Life Tenant's Question No. 1).

"Is the surviving spouse to be paid any income from business transacted by the executor during the administration of the estate, prior to the setting up of the trust estate, in addition to the amount allowed her for her support?"

The life tenant's question No. 1 is substantially the same, couched in different language.

It is the contention of the trustee and remaindermen that the life tenant was not entitled to any income during the administration of the estate. This was the finding of the referee. The life tenant contends that her income began as of the date of the testator's death.

The fact that a liberal year's allowance was given to the widow and that she was the beneficiary in certain life insurance policies on the life of the testator should be given little or no consideration in determining this question; at least this fact is in no sense controlling. The intention of the testator must be drawn from the four corners of the will.

Two distinct rules have been followed. The Massachusetts rule is that the life beneficiary is entitled to the income, unless the will other wise provides; the New York rule is that such income is capitalized as part of the trust corpus when the trust is established. Ohio has followed the Massachusetts rule and this principle of law is laid down in **Davidson v. Savings & Trust Co., 129 Oh St 418**, 195 N. E. 845. The third paragraph of the syllabus is as follows:

"Where one is bequeathed the income from certain property for life, he is entitled to such income from the death of the testator, in the absence of anything in the will to the contrary."

On page 429 of the opinion the Court states:

"It is stated in 2 Perry on Trusts and Trustees (7 Ed.), 939, Section 551, that 'The general rule is now well established that when property is devised or bequeathed in trust to pay the income to a person for life or for a limited time, he is entitled to either actual or equitable income from the date of the testator's death, unless the testator has indicated an intention that the enjoyment of income shall not begin until some later date.' Authorities confirming this general proposition are legion."

In **Hegner v. Hegner, 9 Oh Ap 147,** motion to certify overruled, 15 O. L. Rep. 199, it was held that if the income did not go to the income beneficiary it would place upon the life tenant the burden of the payment of the debts and costs of administration which are properly charged to corpus. See also Page on Wills, Lifetime Ed., Vol. 4, Section 1591, page 526; Bogert on Trusts and Trustees, Vol. 4, Pt. 1, Section 811, page 155; Schouler on Wills, Vol. 4, Section 3158, page 2616; Restatement of the Law, Trusts, Section 234; Scott on Trusts, Vol. 2, Sec. 234, PP. 1277, 1282.

We look to the will to determine whether the testator used any language which indicated that the income of the life tenant should begin at a date later than the date of the death of the testator. No such words are found in the will. No time is fixed.

The trustee and remaindermen contend that it is significant that in Items II, III and IV in which the testator leaves pecuniary legacies to his two sisters and a brother he uses the expression "executor or trustee" whereas in Item V the testator directs "my said trustee" to pay the income derived from the trust res to the life tenant. It is contended that since the testaor did not provide that the "executor or trustee" should pay the income to the life beneficiary, the testator manifested an intention that only the trustee should pay the income, and it is concluded that the trustee can only pay to the life beneficiary income produced from the trust after it is set up. We cannot agree. A different principle of law is applicable to the payment of the general pecuniary legacies. Under the Ohio law the payment of these pecuniary legacies would not be due until the time had expired for the settlement of the estate. **Vol. 41, O. Jur., page**

972. The testator provided that such legacies should be paid in monthly installments. Not knowing when the estate would be settled the testator used both fiduciary terms, and there is support for the contention that the words "executor" and "trustee" were used rather loosely throughout the will.

The income beneficiary of the trust can only receive the income from the trustee and not from the executor, but this fact has never militated against the right of the income beneficiary to receive the income after the death of the testator from the trustee after the trust is established. From the moment the will is probated both the executor and trustee must recognize the problem involved in that income from property which thereafter goes into the trust must be accounted for, as well as income from property which is appropriated for the purpose of paying debts, costs of administration, etc. The executor pays such income to the trustee at the time the trust is established and the trustee in turn accounts to the income beneficiary for such income. Scott on Trusts, Vol. 2, Sec. 234.2, P. 1278 (cases cited); see, Mulcahy v. Johnson, 80 Colo. 499, 504, 252 P. 816; Estate of Marre, 18 Cal. (2d) 184, 190. The executor and trustee failed to segregate principal and income as required and this must now be done in a proper accounting.

An extended annotation on this question is found in Vol. 70 A. L. R. 636, supplemented by an annotation in Vol. 105 A. L. R. 1194 and Vol. 158 A. L. R. 441. The many cases cited by counsel in the briefs are referred to in these annotations. Space does not permit a review of all of these cases. We are content to quote several conclusions of the editor which answer the contentions made by the trustee and remaindermen. In Vol. 70 A. L. R. 638 it is stated that the right of the life tenant to the income from date of death "* * *is not altered by the fact that the income does not become due or payable until after the close of the administration, or that the residue of the estate (the corpus of the trust) cannot be determined until the close of administration—the question being merely one of postponement of the enjoyment of the income, as distinguished from the vesting of the right thereto.

"The general rule is based upon the presumed intention of the testator to favor, in the absence of an expressed intention to the contrary, the immediate object of his bounty, in preference to more remote beneficiaries, who may not even be in esse at the time of his death."

Where the provisions in the will indicate that the income is given for support and maintenance the courts universally

hold in favor of the life tenant. However, it is held on page 639 that the better view is that the rule rests

"* * * on the equity which seeks to give to each (the life tenant and the remainderman) his due, and it is not, in its application, confined to gifts of maintenance and support."

On page 644 it is stated:

"The result reached in cases of gifts of the income of residue is also reached (perhaps with stronger reason) in cases of gifts of the income of a specified sum taken out of the general estate. And this is so, though the present enjoyment of the income may be postponed until after the settlement of the estate."

This statement applies with much force to the facts in the instant case, where the principal asset in the corpus of the trust is the laundry, the income from which is given to the life tenant as a specified legacy. Comment on this situation is found on page 647, as follows:

"In case the corpus of the trust fund is a specified amount, there is little ground for the contention that the testator intended that ·the right of the beneficiary of the income should not accrue until the amount of which the income is payable is determined, as may be contended in case of the income of the residue. On the other hand, the fact that the corpus of the fund is fixed is an indication that the testator intended that the remainderman should receive no more than the sum fixed, unless the remainderman is also the residuary legatee.

"The general rule is not altered by the fact that the will directs the executor or trustee to invest the fund."

On page 641 it is stated that even though the trust cannot be set up until the administration is complete

"* * * in the sight of the law the trust is in progress from the testator's death unless a contrary intent is apparent in the will. If this were not so, the time when the income should become payable would be subject to the caprice or neglect of executors, or casual delays in the probate; and hence income which accrues between the death of the testator and the setting apart of the fund for the purposes of the trust must be paid to the beneficiary."

In Vol. 105 A. L. R. page 1194 it is stated, and we so hold in the instant case, that the question presented,

"involves a controversy between the life beneficiary and the person entitled to the corpus of the trust fund."

In Vol. 158 A. L. R. page 442 the general rule is restated and the rule is not altered by the fact that the will provides that the trustee rather than the executor is to pay the income, or

that the income is not due and payable until the close of the administration. Many recent cases are cited in support of this rule.

The state of Wisconsin has recently reversed its position and has adopted the Massachusetts rule. In Will of Leitsch, 185 Wis. 257, 201 N. W. 284. In Mulcahy v. Johnson, supra, the Court said:

"In all doubtful cases the interest of the life tenants are to be preferred to the interests of the remainder-men."

See also Davis v. Harbaugh, 76 Colo. 73, 230 P. 103.

The facts in the instant case are even more favorable to the life tenant than the facts in any of the cases cited in which the life tenant was decreed the income from the date of the death of the testator. In the instant case no other provision was made in the will for the life tenant; the income was for her use and benefit for and during her natural life; under the will and the evidence it may reasonably be concluded that the income given by the testator to his widow was in the nature of maintenance and support. With respect to the laundry, the income was payable out of a specific part of the assets of the estate and trust; no segregation was required to determine this part of the trust res. The life tenant here was the first object of the testator's bounty. No date is fixed in the will from which the life tenant is entitled to receive the income. There is no provision in the will, express or implied, which would require a construction denying to the life tenant the income from the date of death of the testator.

Another question requires an answer. Who receives the income derived from assets which are used in the liquidation of the estate? Is it treated as income or corpus? The courts have promulgated two distinct rules. The Massachusetts rule which is the better rule is that income derived from funds or assets subsequently appropriated in the payment of debts, administration expenses, taxes, etc., constitute income, and not corpus, and, as such, is payable to the income beneficiary. The New York rule, which is very similar to the English rule, is that such income, if not disposed of by express terms of the will, is added to the trust res as part of the corpus. It is stated that the New York rule is supported by the decided weight of authority. The New York rule is followed in Connecticut, Delaware, Kentucky, Maryland, New Hampshire, New Jersey, and the English cases. The Massachusetts rule is followed in North Carolina and Rhode Island. In Proctor v. American Security & Trust Co., 69 App. D. C. (United States Court of Appeals for the District of Columbia), 98 Fed. 2d 599, the Court ap-

proved and followed the New York rule. The Restatement of the Law, Trust, Section 234, page 695, supports the New York rule. It is stated that the Massachusetts rule is simpler and easier to apply. See Scott on Trusts, Vol. 2, Section 234.4 P. 1284. There is no reported case by the reviewing courts of this state on this question. However, we do find that this question was before Honorable Nelson J. Brewer, Probate Judge of Cuyahoga County, in **Central National Bank of Cleveland v. Coyle, 40 Abs 441, 57 N. E. (2d) (14 Ohio Supp.) 115 (1943).** Judge Brewer, in a well-considered opinion, discusses the two principal rules which are generally followed and on page 448 concludes that in that case the intention of the testator would be better served by applying the Massachusetts rule, stating his reasons as follows:

"This finding is based on the belief that the life tenant is generally the prime object of the bounty of the testator and is his first consideration, while the ultimate beneficiary has secondary consideration and, therefore, any favoring between the life tenant and the ultimate beneficiary should be in behalf of the life tenant.

"By following the Massachusetts rule the administration of both the estate and the trust can be greatly simplified since the complicated accounting necessary under the New York-English rule can be avoided. This would further tend to eliminate possible litigation which might arise as a result of the accounting.

"The fact that the State of New York, by statute, has abrogated the rule established in its courts also indicates that the intention of the law generally is to favor the life tenant."

We believe the Massachusetts rule to be the better rule. In view of the holding of this Court respecting the first phase of the question presented, and because the testator provided that the legacies to Mann, Watson and Thomas were to be paid by the "executor and trustee" in monthly installments and made the payment of such legacies a charge on income from property other than the laundry, it would better serve the intention of the testator to regard such income as "income" rather than "corpus."

The finding of the referee will be set aside and an order will be made in conformity herewith.

Trustee's Question No. 8 (Life Tenant's Question No. 5)

"Are the specific legacies to the other defendants to be charged to the corpus of the estate and trust, or to the income from the trust businesses?"

Life tenant's Question No. 5 is similar in import to trustee's Question No. 8.

It is the contention of the trustee and legatees that all the

legacies are payable out of income. The life tenant contends that assets should have been set aside by the executor-trustee at once from the corpus of the estate and invested in Government Bonds or other securities of like nature, under the provisions of Item IV of the will.

In Items II, III and IV testator left to each of his two sisters and to a brother the sum of $15,000 and provided that the same should be paid to them by his executor and trustee at the rate of $100 per month, or in a greater sum should the executor or trustee deem it necessary and convenient to pay more than $100 per month.

In Item IV is found a precatory provision wherein the testator expressed his wish that his trustee shall hold, manage and control the bequests made in Items II, III and IV and that his executor and trustee shall invest the said funds in Government bonds or other securities of like nature as his trustee in his discretion may deem best. In Item V the testator provides that the trustee should pay to his wife, in addition to the income from the Atlas Linen, Laundry and Supply "any other income that he may have after the payment of the other monthly legacies which I herebefore have set out." In this latter provision the testator makes the payment of the monthly legacies a charge upon any income which the trustee receives which is derived from any source other than the Atlas Linen, Laundry and Supply.

In the codicil testator leaves $10,000 to Margaret Cassidy, payable in monthly installments of $100 each, and makes the payment of the same, together with interest on the unpaid balance, "A charge upon my business, which is known as the Atlas Linen, Laundry and Supply." No question is raised with respect to the legacy of Margaret Cassidy. It is definitely made a charge upon the income from the laundry business and the trustee has paid this legacy in full from the income derived from such business. The dispute between the life tenant, the trustee, and the legatees relates to the payment of the three $15,000 legacies left to the two sisters and the brother.

The trustee never invested funds in Government bonds or other securities or made any effort to set up a fund out of which the legacies could be paid. The trustee contends that upon liquidation of the estate there were not sufficient assets to carry out the precatory provision in Item IV. The provision being precatory in character compliance was not required. The record shows that the trustee paid these legacies out of the net income of the trust. See Plaintiff's Exh. X.

The three legacies given in Items II, III and IV are general pecuniary legacies. Page on Wills, Lifetime Ed., Vol. IV,

page 107, Section 1393. See also Estate of Painter, 150 Cal. 498; Kearns v. Kearns, 77 N. J. Eq. 453; Koehl v. Haase, 125 N. J. Eq. 567; In re Corby's Estate, 154 Mich. 353; Henderson v. First National Bank, 189 Ga. 175; Weed v. Hoge, 85 Conn. 490; Robinson v. McIver, 63 N. C. 645; Dauel v. Arnold, 201. Ill. 570.

The provision in Item V whereby the testator provided that the income from the laundry business should be paid to his wife for life is a specific legacy. The fact that this provision is found in a general residuary clause does not take away its character as a specific legacy. **Vol. 41 O. Jur., pages 857, 865, 871.** In **Koontz, Exr., v. Hubley, 19 Oh Ap 484,** affirmed by the Supreme Court in **111 Oh St 414,** the testator left a specific devise in the general residuary clause. The Court, on page 488, says:

"That the real estate devised is mentioned in the residuary item would not in itself defeat the specific character of the devise, 40 Cyc., 1871-1877; 2 Alexander on Wills, pages 974-975, 28 Ruling Case Law, page 297, and cases therein cited."

We find the principle of law well established that a specific legacy or devise may be embraced in the residuary clause. Vol. 47 Am. Jur. pages 952, 953, Section 1422. In **Knepper v. Knepper, Exr., 103 Oh St 529,** 134 N. E. 476, the Court held that the intention of a testator to charge legacies on specifically devised property must clearly appear or be clearly deducible from the language of the will. In the case at bar the testator clearly indicates his intention that the three general pecuniary legacies in question should be made a charge only on "any other income" that he may have exclusive of income derived from the Atlas Linen, Laundry and Supply, which was the subject of a specific legacy left to the life tenant.

Where a conflict arises in the liquidation of an estate, or the payment of general and specific legacies, the property which is the subject of the specific legacies must at all hazards be protected for the payment of the specific legacies, and if the property other than the assets bound by the specific legacies is insufficient to pay the general legacies an abatement of the general legacies takes place.

In the instant case the three general pecuniary legacies should have been paid out of personal property and if the personal property was insufficient, payment would then be made out of real estate, or any property in the estate or the income therefrom, other than the Atlas Linen, Laundry and Supply. These three legacies would be a charge only on income derived from trust property other than the Atlas Linen, Laundry and Supply.

General legacies will abate in order to pay the specific legacies in full, even if it involves the complete obliteration of a general legacy. See **Vol. 41 O. Jur. page 962, Section 845.** Page on Wills, Lifetime Ed., Vol. 4, page 328, Section 1498. The payment of these legacies has not been made a charge on the laundry business or on the income derived therefrom. It was the purpose of the testator to give the income from the laundry business to his wife as the primary object of his bounty. The income from the laundry business was the only property which he gave to his wife and the testator clearly shows his intention to protect her income against all other claimants, except the Cassidy legacy.

The fact that the testator provided that these three legacies should be paid by the trustee does not make them a charge on the laundry business. The testator undoubtedly believed that there would be other assets in the trust from which an income might be derived out of which the legacies could be paid. As a matter of fact there are assets in the trust other than the laundry business from which the trustee has derived an income and which may be liquidated for the purpose of paying these legacies.

The trustee contends, and the referee apparently is in accord, that inasmuch as the testator provided that his laundry business should continue to operate as long as it proved profitable that it was the testator's wish that the three legacies in question should be paid out of the income from the laundry business rather than bring about a liquidation of the laundry business for the purpose of paying such legacies. The fallacy of this contention lies in the .fact that general pecuniary legacies must abate, either in whole or in part, as against the payment of specific legacies.

There may be sufficient property available other than the laundry business out of which these legacies may be paid. It will require the services of an accountant to check the records of the administration of the estate by the executor and to segregate the assets of the estate and trust, setting apart all assets which came into the trust other than the laundry business, for the purpose of determining whether upon the liquidation of such assets and the payment of debts and costs of administration and other expenses properly chargeable to such assets there will be sufficient amount of property remaining or income therefrom for the payment of such legacies.

We set aside the finding of the referee and hold that the specific legacies mentioned in Items II, III and IV of the testator's will are a charge upon the corpus of the estate and the trust and the income derived therefrom exclusive of that

portion of the corpus of the estate and trust represented by the laundry business or income derived therefrom.

### Trustee's Question No. 9.

"Is the interest accruing, subsequent to testator's death, on his obligations and on obligations incurred by the executor-trustee, subsequent to testator's death, to be charged to income from the operation of the trust property, or to corpus?"

The referee found that interest accruing, subsequent to testator's death, on his obligations and on obligations incurred by the executor and trustee, subsequent to testator's death, are to be charged to the income from the operation of the trust estate.

Here again there is a failure to preserve and protect the income due the life tenant from the trust and to first charge against the general assets of the estate interest accruing on obligations incurred by the testator prior to his death. Interest accruing on obligations incurred by the testator should be paid out of the corpus of estate—first out of the personal property of the decedent and then the real estate other than the Atlas business. Interest on obligations incurred by the executor-trustee which do not grow out of the operation of the Atlas business, are chargeable to property or income therefrom exclusive of the laundry business. Interest on obligations incurred by the executor-trustee in the operation of the laundry business are chargeable to income from said business.

We set aside the finding of the referee and make an order in accordance herewith.

### Trustee's Question No. 10.

"Did the testator intend that the mortgage debt on the parcel of land and building thereon, from which was and is conducted the Atlas Linen, Laundry and Supply business, be paid out of income from either the real estate business or the laundry and supply business, or out of the corpus of the trust property; and if out of corpus, out of what corpus; that is to say, the laundry and supply chattels or the corpus of the real estate?"

The referee found from the evidence that on the date of the testator's death there was a mortgage balance on the Atlas plant site in amount of $17,500 with accrued interest amounting to $80.21. The referee made a finding that the mortgage debt on the Atlas plant site, existing at testator's death, should be paid from any part of the corpus of the estate, so long as it is not necessary to interfere with the operation of the Atlas Linen, Laundry and Supply business.

We modify the finding of the referee by being more specific in holding that the mortgage debt and interest accruing

thereon should first be paid out of personal property and if the personal property is insufficient, then out of real estate in said estate exclusive of the Atlas business. If such assets are insufficient to liquidate the obligation the Atlas business would be charged for the payment of said obligation.

Trustee's Question No. 11.

"Did the testator intend that any part of the other mortgage obligations, and if so what part, shall be paid out of the corpus or any part of the income, and if out of income, what income; that is to say, profits on the sale of the parcels of real estate, or the income from any source?"

The referee was correct in construing this question to apply only to existing mortgage indebtedness other than that on the Atlas plant at the time of the testator's death and additional mortgage indebtedness incurred by the trustee on real estate other than the Atlas plant. The referee found that the mortgage indebtedness and accrued interest as of testator's death is a charge against the corpus of the estate.

We modify this finding, holding that mortgage indebtedness and accrued interest as of the testator's death is first a charge against the personal property and next against the real estate, exclusive of the laundry business and, finally, against the laundry business if other assets are insufficient to make payment.

The referee further found that mortgage indebtedness incurred by the trustee was for the purpose of completing construction of homes for liquidation on a number of vacant lots left by the testator. The referee further found that some of the money realized on construction mortgage loans on such property was used in the operation of the laundry business; that the exact amount of money derived from the construction business which was used in the laundry business is not definitely clear but that a substantial amount of such money was used is undisputed.

On the basis of these facts the referee found that so much of the proceeds of the mortgage loans for construction purposes as went into construction of houses upon real estate for residence property to be sold was a charge against the corpus and payable out of the corpus; that is, proceeds of the sale of said property. We interpret the finding of the referee to mean that mortgages on real estate involved in the construction business would be paid out of the proceeds derived from the sale of said real estate. We believe this to be the proper finding.

The referee further found and held that so much of the proceeds of the mortgage loan construction money as was used in the operation of the laundry business is a charge

against income of the trust estate because that amounts to the use of corpus funds for the payment of charges against income. In view of this Court's ruling on other matters it becomes necessary to segregate the income derived from the operation of the Atlas plant from the income derived from other assets and particularly the conduct of the residential construction business. The segregation is made necessary by reason of the fact that the three legacies herein must be paid out of assets or income derived therefrom other than the laundry business. Therefore, any proceeds derived from the sale of houses constructed by the testator or the executor-trustee, or any profits derived therefrom which have been used in the laundry business, should be withdrawn and used for the purpose of liquidating the debts of the estate and other expenses incident to its administration and, finally, for the payment of said legacies. Any money thrown into the operation of the laundry business which was derived from some other source, together with six per cent simple interest, would be a charge against the income of the laundry business. The accountant, upon segregation of the assets and income therefrom should make the proper adjustment, charging the laundry business with so much of the profits and income which came from other sources and placing in a separate fund such proceeds in order to determine whether there will be sufficient assets to pay the three legacies mentioned above.

The referee's finding is modified in accordance herewith.

### Trustee's Question No. 12.

"Are profits from sales of real estate to be credited to and become a part of the trust estate corpus, or to be treated as income and disbursed accordingly; or if treated as income, how much of the sale money is profit?"

The referee found that under the will and codicil the trustee was empowered to continue residential construction business; that the executor-trustee as rapidly as possible sold the lots and constructed houses on the vacant lots in an effort to avoid losses; that the trustee's sole object was to liquidate this part of the estate and concentrate upon the operation of the laundry business. The referee held that the real estate construction business was not in fact a business conducted by the trust but rather a process of liquidation and for that reason all the real estate transactions of the trustee were corpus transactions. The referee further found that there was considerable outstanding indebtedness against the real estate at the time of the testator's death and that the entire operation of the real estate construction business was directed to the end that this indebtedness be liquidated. The

executor and trustee did liquidate this indebtedness. The referee held that any profits derived therefrom must be allocated to the corpus of the estate.

We are in accord with the finding of the referee. See **Willis v. Holcomb, 83 Oh St 254, 94 N. E. 486; Devenney v. Devenney, 74 Oh St 96, 77 N. E. 688;** Restatement of the Law, Trusts, Vol. 1, Section 233 (b).

Trustee's Question No. 13.    (Life Tenant's Question No. 4.)

"Shall premiums on the policy insuring the life of Harry B. Holmes, as trustee, for the sole benefit of this trust, be charged to income from any source or be charged to the corpus of the trust estate?"

The trustee and the legatees contend that the trustee had authority under the will and under the law to insure his life for the benefit of the trust and pay the premiums out of income.    The life tenant contends that the trustee had no such authority.

With respect to the factual development the referee found that on March 27, 1942, the Probate Court approved the application to purchase the life insurance; that on April 7, 1942, the trustee purchased a life insurance policy on his life, No. 671965 in the Lincoln National Life Insurance Company of Ft. Wayne, Ind., the principal amount of the insurance being $75,000 for the first sixteen policy years and $36,225 for the remaining policy years, the annual premium being $2,264.25, making the trustee of the Estate of Clay M. Thomas the beneficiary of said policy.    The referee found from the evidence that from April 7, 1942, the date of the policy, to August 31, 1946, the end of the period of accounting under consideration in this case, the total expenses of insurance charged to the income of the trust amounted to $6,961.75. See Plaintiff's Exhibit X, page 121, Schedule 20.    The trustee reasoned that the testator in giving authority to his trustee in Item VI of his will "to do all things necessary or proper in the usual course of said business" authorized the trustee to insure his life for the benefit of the trust in pursuance of a common practice among officers and executives of corporations.    The referee further found that the trustee was authorized to purchase said insurance under the provisions of §10506-41 GC, and that the premiums on the policy were properly chargeable to income but ordered a change of beneficiaries so that the proceeds of the policy would be payable to the life tenant in conformity to the provisions of §10506-41 GC.

We find that the application filed in Probate Court did not state whether the premiums were chargeable to income or

corpus and to whom the insurance proceeds would be made payable. It is asserted that upon examination of the will there is found no limitation on .the authority of the trustee which would preclude the purchase of the insurance and that for this reason the trustee was authorized to make the purchase. This Court cannot follow this line of reasoning.

We are of the opinion that unless the terms of the will expressly authorize the trustee to purchase insurance he has no authority to do so. We find no provision in the will expressly or by implication authorizing the trustee to make purchase of insurance on his life for the benefit of the trust or any of the beneficiaries.

We come now to a consideration of **§10506-41 GC**. This section provides for and controls investments of trust funds by executors, guardians or trustees. The applicable part of the section is as follows:

"Except as may be otherwise provided by law, or by the instrument creating a trust, **a fiduciary having funds belonging to the trust which are to be invested may invest them in the following**:

\* \* \*

"(f) Life, endowment or annuity contracts of legal reserve life insurance companies regulated by the provisions of chapters 1 and 2 of subdivision I of division III of title IX (§9339 et seq. GC) and duly licensed by the superintendent of insurance of Ohio to transact business within the state. The purchase of contracts authorized by this subsection shall be limited to executors or the successors to their powers when specifically authorized by will, and to guardians and trustees. Such contracts may be issued on the life or lives of a ward or wards, a beneficiary or beneficiaries of a trust fund, or according to the terms of a will, or upon the life or lives of persons in whom such ward or beneficiary has an insurable interest. **Such contracts shall be so drawn by the insuring company, that the proceeds or avails thereof shall be the sole property of the person or persons whose funds are invested therein.**" (Emphasis ours.)

The term "fiduciary" in the first paragraph of this section embraces "trustee." It will be observed that the fiduciary can only invest in life insurance under the provisions of this section when he has funds belonging to the trust which are to be invested. In the instant case the income from the trust does not constitute funds in the hands of the trustee which he is authorized to invest. The income from the trust is payable to the life tenant. Furthermore, conceding that the trustee had authority, either under the will or under the law, to purchase the insurance, this section

specifically provides that the contract of insurance shall be so drawn that the proceeds thereof shall be the sole property of the person whose funds are invested therein. In conformity with the provisions of this section the referee ordered the change of beneficiaries so that the contract of insurance would provide that the proceeds thereof would be payable to the life tenant.

We are of the opinion that the trustee had no authority, either under the will or under the law, to purchase the insurance and to charge the expense thereof to the income of the life tenant. The findings of the referee will be set aside and an order will be made in accordance herewith. The trustee will be surcharged with all expenses of the insurance chargeable to the income of the life tenant.

### Trustee's Question No. 14

"Are real estate and personal property taxes accruing since May 1, 1938, to be charged to the income derived from the operation of the trust property, or to corpus?"

In general we are in accord with the finding of the referee that real estate and personal property taxes accruing since May 1, 1938 are charges against income derived from the operation of the trust estate. However, in view of our holding on other matters we order a segregation of the Atlas business from other assets in the trust and hold that real estate and personal property taxes accruing since May 1, 1938 on the laundry business should be charged to the income from the laundry business and that real estate and personal property taxes accruing since May 1, 1938 on other assets, exclusive of the laundry business, should be chargeable to the income derived from such other assets. We order a modification of the finding of the referee in accordance herewith.

### PART VI.

We come now to consider the questions propounded by the life tenant in her answer. Questions numbered 1, 2, 3, 4 and 5 propounded by the life tenant in her answer have been answered in questions propounded by the trustee. However, the life tenant has propounded certain questions which require specific answers.

### Life Tenant's Question No. 6

"Is the trustee authorized to convert the real estate of the estate, other than that used in the laundry business, into cash and spend this cash in the enlargement and additions of the original laundry business?"

The referee found that in Item VI of the will the trustee is given "full power and authority to sell and dispose of any or all of the estate, to sell at public or private sale, at such price and upon such terms of credit or otherwise as the

trustee may deem best, the whole or any part of the real or personal property"; and that in Item VI of the will, and also in the codicil, the trustee is given full power and authority to conduct and carry on the laundry business so long as it proves profitable. The referee found that so much of the profits from such sales as have been used to improve the Atlas Linen, Laundry and Supply business are expenditures from corpus; that on the other hand, any of the profits from real estate sales used for plant operations of the Atlas business should be returned to corpus from income.

Again there is a failure to take into consideration a segregation of the assets of the trust; that is, the Atlas business from all other assets in order to determine whether or not the three legacies may be paid. Unquestionably, the trustee had full power and authority to convert the real estate into cash. But the cash derived from such conversion of real estate should first be used to liquidate the indebtedness of the estate and for the payment of the three legacies above mentioned. If, after the payment of all claims against the estate and the cost of administration and the three legacies mentioned above, there would still remain assets in the trust from which a portion was thrown into the operation of the laundry business, such portion of the assets which were used in the laundry business would become a part of the corpus. This question applies only to proceeds derived from the sale of real estate. It does not involve income derived from real estate.

We have heretofore held that the trustee has no authority to make additions to the laundry business. We accord to the trustee authority to replace old machinery with more modern and efficient machinery, and the purchase of more efficient equipment to take care of an expanded trade. We realize that skillful management would ordinarily cause an increase of business and to that extent an enlargement would be accepted as proper. But the purchase of competing businesses and the equipment therefrom, and additional machinery to take care of such enlarged business is not within the power conferred on the trustee. But having done so, it now is a matter of accounting between the life tenant and remaindermen. Such additions are charged to corpus and a depreciation charge made annually against the income during the life of such additions.

The referee's finding is set aside and a finding made in conformity herewith.

Life Tenant's Question No. 7.

"May the trustee use the income of the trust in enlarging and adding to the original laundry business?"

The question here raised was discussed in answer to trustee's question No. 2 and life tenant's question No. 6. The answer to this question will conform to the answers given to those two questions. Further discussion is unnecessary.

Life Tenant's Question No. 8.

"What is the amount now due this answering defendant from the trustee under the terms of the will and under the terms of the trust created by the will of the decedent?"

The period covered by the trust operation, for the purpose of this action, begins January 1, 1939, the date on which the trust was established, to August 31, 1946, the closing date of the accounting made by the expert accountants for the Court.

The referee found that during this period the trustee paid to the life tenant as income the total sum of $263,299.72. See Plaintiff's Exhibit X, Schedule 34, pages 145, 166. The life tenant claims that the net income of the trust during this period amounted to $420,251.22 and that after deducting the Margaret Cassidy legacy there is due her for this accounting period the sum of $146,102.57, together with other items, including the costs of repairs, depreciation, cost of purchasing competing businesses, float, making a total claim of $1,171,369.17. The referee found that the claims of the life tenant with respect to these income items was unfounded. The referee further found that the sum of $420,251.22, which has been designated as "net income" in Plaintiff's Exhibit A, page 26, does not properly represent the amount due the life tenant under the provisions of the will. The referee distinguished between net income and distributable income, i. e., from the net income there was deducted certain charges, leaving a balance which has been conveniently designated as distributable income. That under the terms of the will, the life tenant is not entitled to "net income" but is only entitled to receive what the referee found to be distributable income. The referee found that after making certain deductions the distributable income for the period amounted to $198,441.33, which shows an overpayment to the life tenant for the period of $64,858.39.

As heretofore stated, this Court can find no objection to making a distinction between net income and distributable income, if the proper method is pursued in determining net income and distributable income.

In view of the ruling of this Court and the modification of the referee's findings on a number of issues raised in this proceeding, this Court cannot at this time determine what amount is due the life tenant. A further accounting must be had to determine this amount.

The Court sets aside the finding of the referee on this issue.

Life Tenant's Question No. 9.

"Should the cost and the expenses of this litigation be charged to the income of the life tenant, or to the corpus of the remaindermen?"

The life tenant contends that all expenses of this litigation should be charged to the corpus. The trustee and the remaindermen contend that the expenses of this litigation are properly chargeable to income on the ground that the demand of the life tenant for additional income in a letter to the trustee dated September 23, 1946, made it necessary that the trustee file this action for declaratory judgment in order to protect the trust estate.

The judgment of the Probate Court charged against the income "all costs incident to, or growing out of this suit, which shall specifically include court costs, stenographic and accounting charges heretofore ordered paid by this Court, and compensation to the special master commissioner, attorney for the trustee and attorney for Clara J. Thomas Mann, Millie K. Thomas Watson, Ray G. Thomas and Margaret Cassidy, which have been or may hereafter be allowed to them for their services in this suit." The referee approved this finding.

This action for declaratory judgment, which is essentially an action to construe the will and for a proper accounting between the life tenant and the remaindermen, as well as between the life tenant and the trustee, was filed in the probate court. **Sec. 10501-22 GC,** was amended effective August 22, 1941, by adding to this section the following paragraph:

"Unless it is expressly otherwise provided by law, in actions or proceedings had in the Probate Court, whether ex parte or adverse in character, the court may award and tax costs, and apportion them between the parties, on the same or adverse sides, as it adjudges to be right and equitable."

The purpose of this amendment was to confer upon the Probate Court the same general power to award and tax costs and apportion them between the parties as is conferred upon Courts of Common Pleas by §11628 GC.

The term "costs," as used in this section, includes not only court costs but also other expenses incident to the litigation with respect to which the Court may make an award and finding. In our opinion, in addition to court costs it includes compensation to the special master commissioner, stenographic and accounting charges, and compensation to counsel for the respective parties which may be properly chargeable to the income or the corpus.

The finding which we make in this matter embraces not only expenses heretofore incurred for compensation already

fixed, but also compensation to the referee appointed by this Court and any additional court costs or expenses incident to this litigation.

This Court not only has statutory authority but has the inherent discretionary power to apportion the cost of the expenses of this litigation "as it adjudges to be right and equitable."

The Probate Court, by a proper order, has allocated to the removal proceeding a certain portion of the costs and expenses allowed in the prosecution of both proceedings which were consolidated and heard together by the special master commissioner. However, the greater portion of the costs and expenses has been allocated to this proceeding.

This Court, in the removal proceedings, Case No. 4302, which was instituted on application of the life tenant, taxed all costs incident to that proceeding against the income of the trust on the ground that since the life tenant instituted the proceedings and failed to support her claims it was only fair and equitable that she pay the costs of that proceeding. The rule applied by this Court in the removal proceeding has little or no application to this proceeding.

The referee found that all costs and expenses allocated to this proceeding should be charged to the income on the ground that "the life tenant necessitated the litigation." The fact is that the proceeding was instituted by the trustee and not by the life tenant. True, the life tenant, in a letter under date of September 23, 1946, directed to the trustee, made a demand for the payment of income far in excess of that which was due her. However, the trustee instituted this action within ten days thereafter, and alleged in his petition that "the plaintiff is in doubt and cannot safely proceed without the instructions of the court." Then he propounds numerous questions involving the administration of the trust from its very inception. The issues presented in this proceeding should have been presented to the Court for determination at the time the trust was established. Mr. Landgrave, the bookkeeper, testified he told the trustee and also the life tenant that certain questions must be determined in order for him to set up the books properly to determine the correct amount due the life tenant. See page 722 of the record. On page 724 of the record Mr. Landgrave testified as follows:

"In our reports to the court we never told what may have been or what may not have been due to the life tenant on our records.

"We didn't know what that amount might be and so set

it up as net profit—net worth and undistributed income, never determined it."

Again on page 726 of the record, Mr. Landgrave testified that until 1946 no distribution account was carried on the books and that it was impossible to tell how much was due the life tenant at the end of the year. On page 727, Mr. Landgrave testified that he told the trustee that he could not set up the books properly to determine these matters until certain other matters were determined. He also testified on page 728 that it was the life tenant who first approached him and not the trustee to properly set up the books to determine the amount due her.

The record also shows that for the year 1945 she paid an income tax on an amount which was far in excess of the amount which was received as distributable income in cash. This income tax return was prepared in the early part of 1946 and it was this incident which provoked the life tenant into making a demand upon the trustee for a proper accounting as to the amount due her. In view of the testimony of the bookkeeper and the failure of the trustee over a period of years to seek the instruction of the Court with respect to questions which had arisen, and the fact that this Court has found that the trustee has not properly accounted for income due the life tenant and has charged to the income certain expenditures which the income should not bear, we conclude that the life tenant was justified in pressing the trustee for a proper accounting in 1946.

The trustee, at the time of the establishment of this trust, should have had an appreciation of the questions involved and it was his duty at that time to seek the instructions of the Court and the interpretation of the will. If he had done so this protracted, expensive litigation would not have arisen. Therefore, we cannot concur in the judgment of the referee that the life tenant necessitated this litigation. Furthermore, conceding that the life tenant provoked the institution of this proceeding, this fact is not controlling and does not serve as a proper basis on which to make the award against the income for the entire cost of the litigation. Some one party must always institute the action and provoke the bringing of an action to determine the issue.

There is no provision in the will which controls the judgment of this Court in determining against whom the expenses of litigation are properly chargeable or the manner in which the expenses should be apportioned between the parties. The Court is constrained to do that which in its judgment seems to be just and equitable. In Restatement

of the Law, Trusts, Vol. 1, page 685, Section 233, is found this statement:

"f. Other expenses. **Expenses other than ordinary current expenses are ordinarily payable out of principal.** Thus, the trustee's commissions in respect of principal, the cost of effecting sales, exchanges or acquisitions of any part of the principal, are payable out of principal. Any tax levied by any authority, federal, State or foreign, upon profit or gain which is allocable to principal is payable out of principal, although such tax may be denominated a tax upon income by the taxing authorities.

"g. Expenses of litigation. Expenses incurred by the trustee in maintaining or defending an action to protect the principal of the trust property or to assure the title thereof are payable out of principal, since to the extent that the protection of the principal may have been of benefit to the beneficiary entitled to the income, **payment of the expense from principal automatically throws part of the burden upon the interest of the beneficiary entitled to income. Expenses in maintaining or defending an action to protect only the income are payable out of income. Expenses in maintaining or defending an action to protect the principal of the trust property and income which has accrued at the time of the suit are allocable between principal and income.**" (Emphasis ours.)

This statement of the law indicates the controlling factors on the determinative issue. The Court should apportion the cost and expenses on the basis of benefits received, or should consider for whose protection the litigation was instituted. In Vol. 33, Am. Jur. page 951, Section 428, the text is as follows:

"Although the courts have rarely attempted to lay down any general rules for the determination of the proper source of payment of the expenses of litigation involving a trust estate as between corpus and income, in a few instances certain general propositions bearing on the question have been enunciated. It has been stated and requoted with approval that 'the regular annual or periodically recurring expenses arising in the administration of a productive trust commonly are paid out of the income, **while extraordinary and unusual expenses are chargeable against the capital. The costs of litigation generally fall in the latter class.'** These rules apply in cases where the question concerns life tenants and remaindermen, both guiltless of any wrong against the trust, and where the point of incidence of proper expenses must be determined as between innocent persons." (Emphasis ours.)

In Vol. 124 A. L. R., page 1183, there is an extended annotation covering this question. On the question as to charging

the cost against the person who necessitated the litigation, on page 1186 is found this note:

"The irregularity with which this consideration has been held to control, however, prohibits its establishment as a general rule in connection with the solution of the question under consideration."

The annotation in A. L. R. covers cases where the cost of litigation is properly chargeable to income or to the corpus or apportioned between the income and corpus. One of the leading cases in this country is In Re Gartenlaub, 185 Cal. 648, 198 Pac. 209, Vol. 16 A. L. R. page 520. Another leading case is that of Cogswell v. Weston, 228 Mass. 219, 117 N. E. 37, which held:

"The regular annual or periodically recurring expenses arising in the administration of a productive trust commonly are paid out of the income, while extraordinary and unusual expenses are chargeable against the capital. The costs of litigation generally fall in the latter class. These rules apply in cases where the question concerns life tenants and remaindermen, both guiltless of any wrong against the trust, and where the point of incidence of proper expenses must be determined as between innocent persons."

The Court in the Gartenlaub case, on page 526 of A. L. R. held:

"Where litigation becomes necessary to remove a doubt or ambiguity so as to insure the correct administration of the trust, the expense is an extraordinary charge, which charge, unless otherwise provided by the testator, should be borne by all parties. **If the expense of litigation incident to the trust is paid from principal, the life tenant, as well as the remaindermen, shares the burden; for in that event the life tenant is deprived of interest on the sum taken from principal.**" (Emphasis ours.)

The author of this opinion, while serving as Probate Judge of Montgomery County, had this question for determination in the case of **Reibold v. Evans, 28 Abs 266; 32 N. E. (2d) (3 Ohio Supp.) 251.** The Court in that case relied on the statement heretofore quoted from Restatement of the Law on Trusts and the case of Cogswell v. Weston, and In re Estate of Gartenlaub heretofore referred to. In that case, the Court apportioned the counsel fees between the life tenant and the remaindermen. An appeal was taken to this Court of Appeals. The case is reported under **Reibold v. Evans, 65 Oh Ap. 123,** 29 N. E. (2d) 369. On page 133 this Court of Appeals held:

"Considering the matter at issue, we find the opinion of the trial court in the case of **Reibold v. Evans** reported in **28 Abs**

266. The case is so well considered and is in such harmony with our own views of this matter that to repeat what is there said or to comment further upon it would be a useless task.

"The opinion of the court is detailed and consistent and well supported by authorities upon which we have checked and we therefore refrain from further discussion of the matter covered by the opinion.

"It will be noted that the opinion ends with the discussion of the proper allocation of attorneys' fees . . . ."

Coming now to apportion the costs and expenses allocated to this litigation the Court must observe that the life tenant employed her own counsel. Counsel fees for the life tenant are not involved. The legatees and remaindermen employed counsel and substantial fees were fixed by the Probate Court. The services of counsel for legatees and remaindermen were rendered in the interest of the legatees and remaindermen. It is the opinion of this Court that compensation paid or to be paid counsel for legatees and remaindermen should be charged one-half to the legatees and one-half to corpus. The trustee employed counsel to institute this proceeding and substantial fees have been fixed by the Probate Court for services rendered. We are of the opinion that the expenses of this proceeding are not ordinary current expenses which are customarily paid out of income. On the other hand we are of the opinion that this proceeding is in the nature of extraordinary litigation affecting the rights of the life tenant, the remaindermen and the trustee. It was necessary that this proceeding be instituted in order to determine numerous questions which had arisen respecting the powers of the trustee, the right of the life tenant on the one hand and the protection of the remaindermen on the other. In such a proceeding it is neither just nor equitable that all of the expenses incurred by the trustee and the expenses incident to the litigation be chargeable to income. If we were to apply with full force the principle of law laid down in Restatement of the Law heretofore quoted that by charging the expenses to principal rather than to income both the remaindermen and the life tenant share the burden of such expenses, we would be justified in charging the entire expense against the corpus. However, in view of the situation which has developed in this litigation, and having in mind the rights of the parties, the benefits accruing as a result of the litigation, we are of the opinion that it would be just and equitable to require the income and the corpus to share an equal burden with respect to compensation allowed the counsel for the trustee for services rendered or to be rendered in this litigation; stenographic

and accounting charges allowed or to be allowed in this litigation and compensation to the special master commissioner and to the referee appointed by this Court and other court costs.

The finding of the referee is set aside and a finding is made by this Court in accordance herewith.

## PART VII.

In whom is the legal title vested?

This question is not propounded by any of the parties hereto but it is touched upon in the briefs and it is contended by the life tenant that Item V of the will vests the legal title in the life tenant. True, in the first clause in Item V, the testator gave all the balance of his property to his wife, in trust, for her use and benefit, for and during her natural life. These words must be read in conjunction with other provisions of the will in which he sets up the trust and directs the trustee to manage and control the trust estate. The words in the first clause have the effect of giving to his wife a life income. The legal title is vested in the trustee by necessary implication. See **City Trust & Savings Bank, Exr. v. Hanley, 17 Oh Ap 467, 468, 469.** It is essential that the Court determine this question in order to avoid complications which may arise in the holdng and passing of trust assets in the past and in the future, particularly as it affects real estate titles. A finding is made in conformity herewith.

### Depreciation and Reserve.

We hold that the proper method of accounting with respect to replacements and additions such as machinery and equipment, which will depreciate through use, is to charge the cost in the first instance to corpus, inasmuch as replacements and additions enhance the value of the corpus, and to place against the income a depreciation charge each year during the useful life of the article. Replacements and additions are given like treatment, both becoming part of the corpus, and are depreciated through use in the production of income. The corpus account is credited each year with the amount of the depreciation charge against income, If the life tenancy does not terminate during the useful life of the article the life tenant has borne the entire expense, since the total amount of the annual depreciation charges against income will equal the cost of the article. If the life tenancy terminates during the useful life of the article, the life tenant has paid the proportionate share of the cost of the article, i. e., as the time during which the life tenant has received income through the use of the article bears to the total number of years of the useful life of the article. Thus the life tenant will receive the total amount of income due her for the accounting period.

The record shows that the trustee charged machinery and

equipment to the capital account and depreciated the article according to the ruling of the Federal Internal Revenue Department, and charged the depreciation as an operating expense. It was the expert accountant who adjusted the records of the bookkeeper for the trustee by charging the cost to income at the time of purchase and allowed a depreciation credit to the life tenant each year during the useful life of the article.

However, the trustee now contends that he will experience financial difficulty if he is required to operate the trust as directed by this Court. The trustee contends that since he has no working capital, and the net income is distributed to the life tenant, he is required of necessity to charge the cost of replacements and additions to income and give the life tenant a depreciation credit each year during the useful life of the article. As we have heretofore stated, we have rejected this method on the ground that it forces the life tenant to finance the operation of the trust out of income, and therefore deprives the life tenant of a substantial portion of her income each accounting period. In our judgment this method is neither fair nor just to the life tenant, and, is contrary to fundamental principles of trust law.

We do not believe the trustee will experience serious difficulty in operating the trust as directed by this Court. We have found that the trustee has no power to purchase additions except machinery and equipment required to take care of the normal increase of trade. Had the trustee, in the conduct of the trust thus far, confined his purchases of replacements and additions to take care of the normal increase of trade, it is our opinion he would have been able to conduct the trust by making bank loans and mortgaging trust property. As a matter of fact the record shows that the trustee did make repeated bank loans and applied to the Probate Court for authority to mortgage the trust res. This is the accepted procedure to be followed by the trustee where there is no working capital. However, it is the duty of the trustee to find working capital. There are assets in the trust, exclusive of the laundry business, which may be liquidated and the proceeds placed in a working capital account, or a reserve account. If a cash reserve account is set up by the trustee, it must be established by the conversion of corpus assets; the life tenant cannot be deprived of income for that purpose. See Scott on Trusts, Section 233.3 in the 1951 supplement, page 116, which reads as follows:

"Where a trust is created for successive beneficiaries, the trustee cannot properly set up a reserve out of income for future improvements. In re MacDonell's Estate, 325 Mich.

449, 39 N. W. (2d) 32 (1949); Matter of Adler, 164 Misc. 541, 299 N. Y. Supp. 542 (1937) (citing Restatement of Trusts, Sections 233, 239); Matter of Davies, —— Misc. ——, 96 N. Y. S. (2d) 191 (1950)."

See also Nelligan v. Long, 320 Mass. 439, 170 A. L. R. 126, 132 (1946), 70 N. E. (2d) 175.

### The Journal Entry.

An order will be made appointing an expert accountant to make an audit in accord with the directions given herein, beginning with the administration of the estate by the executor and extending over the operation of the trust by the trustee to and including December 31, 1950, giving a separate account of the administration of the estate by the executor, and annual accounts of the trust operation.

It is suggested that the firm of Keller, Kirschner, Martin and Clinger be employed unless the parties hereto agree on the appointment of another accountant.

The Court has not formulated definite and specific answers to the questions propounded, believing that it would be sufficient to lay down fundamental principles of law which are applicable and controlling, and being satisfied that counsel will be able to draw the proper journal entry therefrom.

If further instructions are necessary a supplemental application may be filed for that purpose.

The finding of the referee is sustained in part and overruled in part. Counsel will prepare a journal entry in conformity herewith.

HORNBECK, PJ, concurs.
MILLER, J, dissents.

MILLER, J, dissenting.

I cannot concur with my associates in the determination of the amount due the life tenant under the terms of the will. Under Item V of the same she is entitled to all of the income from the Atlas "after the payment of operating expenses and taxes and other charges." It is in the definition of the words "other charges" that the difference arises. The majority opinion seems to place no significance on these words giving them the same interpretation as was given the term "operating expenses." In case of ambiguity or uncertainty in any provision thereof the entire will will be considered and if consistent each and all of the provisions thereof are to be given full effect. Words deliberately used in the will are presumed to have been placed there for a purpose and cannot arbitrarily be ignored. They must be given a meaning to effect the intention of the testator if such intention can

be ascertained and no rule of law violated. See **41 O. Jur. Section 470, Page 605,** and cases cited.

In 67 C. J. S., Page 531, it is said:

"The word 'other,' as defined by all dictionaries and lexicographers, has numerous and various meanings and various shades of meaning, depending on the context in which it is found. It is an adjective, and reference to dictionaries discloses many synonyms. It is a correlative and specifying word. While it is referred to as a word of addition, in its natural, usual, and normal use it indicates some thing or things in addition to, differing from, or both additional to, and differing from, the antecedent thing or things immediately in contemplation. It has been said that the word 'other' ordinarily means different from, different, different in nature or kind, different from that which has been specified; different or distinct from the one or ones mentioned or implied; different person · or thing from the one in view or under consideration or just specified; not the same.

"The word 'other' also is defined as meaning additional or further; in addition to, and different from, those mentioned; not this or these. Another common use of the term 'other' is as meaning one of two or more of a class."

It has been suggested that the doctrine of Ejusdem generis has application here, but this maxim will not be followed when the preceding description is exhaustive so that there can be no more of the same kind. National Surety Co. v. Morris, 36 S. E.· 690, 111 Ga. 307.

The term "operating expenses" is exhaustive and includes in general terms all deductions that may be considered in arriving at the net income of the business. In permitting the deduction of "other charges" in addition to the net income the intention of the testator must be inquired into as to what was meant. The record reveals that Clay Thomas was operating a successful business at the Atlas Laundry, but that he had no working capital. An examination of the appraisement sheet discloses that if all of the other assets were liquidated retaining only the Atlas Laundry there would be a net deficit of $26,659.62 with which to have begun the plant operation. In operating a plant under these conditions Clay Thomas knew that all purchases of new machinery would have to be paid out of income. The will was executed approximately fourteen months before his death and the codicil, only two days before. So no substantial change in the financial picture could have occurred in such a short period of time. Being cognizant of the financial condition of his affairs he most assuredly would not have requested the trustee to operate a business under such conditions that it would have been

impossible to succeed. It must have been for the purpose of assuring the success of the business that he authorized the deduction of "other charges" in arriving at the amount due the life tenant. It might be said that he could have borrowed money to operate the plant, but would any sound financial institution loan money to an organization which was obligated to pay its net income to a life tenant? I think this method of operation would have been impossible of performance. It is therefore my conclusion that the finding of the referee on this particular question should be affirmed.

I must also dissent from the majority opinion in charging to corpus the amount paid for good will in the purchase of the new businesses. The record reveals that the net income in 1941, before the purchase of the 5c Towel & Supply Company and the Bowden Towel & Supply Company was $21,892.64, and in 1943, the year following the purchase, it was $58,340.66. In other words, net income was increased almost three-fold after the purchase of these new businesses. The business still continued to expand thereafter. The net income for 1944 being $61,019.37; for 1945, $79,119.09, and for 1946, the final accounting period, $95,423.76. I am in accord with the majority opinion that the purchase of the new businesses under the facts presented has become a proper charge, but think that it should be against income and not against principal. I am aware of the fact that in many jurisdictions it has been held that where expenditures in administering a trust fund tend to benefit both income and principal, the payment of expenses should be apportioned equitably between the two. Stevens v. Melcher, 80 Hun 514, 30 N. Y. S. 625; In re Vermilye, 100 Misc. 235, 166 N. Y. S. 320; Matter of Kelsey, 89 Misc. 701, 153 N. Y. S. 1095; Rhode Island Hospital Trust Co. v. Waterman, 23 R. I. 342, 50 Atl. 389. But there is authority in Ohio for the proposition that where permanent repairs are made to property for the purpose of conserving the same and for the protection of income, the entire cost may be charged to income.

In the case of **Frye, Trustee, v. Burk, 57 Oh Ap 99,** at **page 111** the Court said:

"It is the duty of the trustee to preserve and conserve the properties of the trust estate for the purpose of producing income to provide means to make the payments provided for in the will; and in the performance of this duty the trustee has the right and power to use the income from the whole of the trust estate in making permanent and expensive repairs to the properties of the estate, subject, however, to the condition that he shall not abuse his discretion in this respect."

It is my opinion that the purchase of the new businesses which were made in the exercise of the sound discretion of the trustee as a good business man, were in the nature of a permanent repair to the Atlas business, made for the purpose of keeping the business on a profitable basis and also for increasing the income for the life tenant. I therefore think the referee was correct in his conclusion that these purchases should be charged to income.

I am in full accord with the majority opinion on all other questions presented.

## ON APPLICATION FOR REHEARING

No. 4303. Decided July 12, 1951.

John H. Summers, Columbus, for plaintiff-appellee.

Herbert & Dombey, Edwin F. Tuttle, of Counsel, Columbus, Pickrel, Schaeffer & Ebeling, Dayton, Ralph Stickle, Cleveland, for defendant-appellant (Life Tenant).

Wright, Harlor, Purpus, Morris & Arnold, Earl F. Morris, of Counsel, Columbus, for defendants-appellees.

## OPINION

By THE COURT.

Submitted on application of trustee for rehearing, for the right to introduce additional evidence by a banker and manufacturer bearing on the question of "depreciation and reserve," and for oral argument, and on the application of the legatees and remaindermen for rehearing and oral argument.

The questions involved in this case were orally argued to the Court and fully presented in extensive briefs before the opinion of this Court was written. Additional briefs are again filed on the applications. No new questions are raised. We do not believe oral argument at this stage is necessary in assisting the Court to reach a determination of the matters presented on the applications.

The trustee requests the introduction of additional evidence to be given by a banker and a manufacturer bearing on the question of "depreciation and reserve." The purpose of such evidence would be to more forcibly present to the Court the financial difficulty which the trustee may encounter in conducting the trust under the will as it has been construed by this Court in its former opinion. This same contention was strongly urged in oral argument and briefs and was considered by this Court. The will must be and has

been construed by this Court from its four corners in order to ascertain the intention of the testator.

The trustee has contended that the will should be construed so as to give him as full and absolute control over the trust as if it were a business operated by a sole proprietor. With this contention the Court did not agree, as stated in the former opinion. The testator may have had good and valid reasons for not giving carte blanche authority to the trustee. Most trusts are operated by trustees under limited powers and this trust can be so operated. Should the trustee experience any financial difficulty in operating the trust, collaboration with the parties in interest, the life tenant and the remaindermen, will be necessary to the end that the trust may be profitably and efficiently operated, for the best interest of all concerned.

This trust is conducted under the will of the testator and under the direction and control of the Probate Court. Inasmuch as there are contingent remaindermen whose interests must be protected, it is suggested that the proper procedure to follow when loans are to be made is to file appropriate application in the Probate Court and give notice to all interested parties. The Probate Courts are constantly called upon to assist in solving such difficulties which arise in the operation of a trust. It may become necessary and it may be for the best interest of the life tenant that she assist in the creation of a cash reserve, or make personal loans to the trustee in order to assure a high level of operation and an ever-increasing income. We need not elaborate further on this matter as the Court is not required to state here the most acceptable method of financing the continued operation of the trust. We have every reason to believe that the trustee and the Probate Court will receive the cooperation of the life tenant and the remaindermen in the continued operation of the trust.

After re-examination the former opinion of this Court, and considering again the various contentions raised by counsel for the trustee, the legatees and remaindermen, we are prompted to modify the former opinion in two particulars. The first matter relates "float." In our former opinion we stated that upon the termination of the trust an adjustment would be required by the life tenant and the remaindermen with respect to the valuation of float and that no adjustment would be required during the continuation of the trust. We adopted the formula used by the Ohio Department of Taxation and the Court instructed the trustee to set up the books and apply this formula so that at each accounting period the rights of the life tenant and remaindermen would

be reflected in regard to material not in inventory and in use. As pointed out by counsel for the trustee, this order, if carried out, would create a tax problem. Inasmuch as the rights of the life tenant and remaindermen are to be adjusted only at the termination of the trust, this Court is now of the opinion that the right of the life tenant and remaindermen in float need not be reflected by an accounting at the end of each accounting period, but only at the termination of the trust. Furthermore, after giving this matter thorough consideration we conclude that the formula adopted by the Ohio Department of Taxation, Intangible Tax Division, is just and fair under certain circumstances, and unjust and unfair under other circumstances, depending on whether the valuation of material not in use at the end of the accounting period is greater or less than the inventory of material not in use at the beginning of the accounting period and the comparative valuation between the inventory of the material not in use and the valuation of float at the end of the accounting period. Furthermore, other and different formulas may be in use at the termination of the trust, the date of which is uncertain. For this reason we modify our former opinion by not requiring the application of this formula. It is sufficient for this Court to find that if at the termination of the trust the inventory of material not in use has a greater value than the inventory of material not in use at the beginning of the trust, such excess valuation represents income, and that if at the termination of the trust the value of float is greater than the value of float at the beginning of the trust, such excess valuation represents income. We prescribe no formula to be used in determining such valuation, as we do not deem it necessary to make such an order under the issues presented.

The other modification relates to the finding of the amount due the life tenant, if any, after an accounting is made in conformity with the Court's judgment. The Court will impress a trust on the assets of the trust for any amount found due the life tenant.

The application for oral argument will be overruled; the application for the right to introduce additional evidence will be overruled; the application for reconsideration of the Courts opinion is sustained in part and overruled in part.

An entry may be drawn in accordance with the former ruling of this Court as modified herein.

HORNBECK, PJ, WISEMAN, J, concur.

MILLER, J, concurs in the modification, but dissents with the order overruling the application for a re-hearing.